**EXECUTION VERSION**

**US$43,300,000 SENIOR SECURED CREDIT FACILITY AGREEMENT**

Dated as of October 5, 2016

Among

**WAYFARE TRANSOCEANIC LLC.**

as Borrower

and

**THE INITIAL LENDERS NAMED HEREIN**

as Initial Lenders

and

**THIRD EYE CAPITAL CORPORATION**

as Administrative Agent, Collateral Agent and Payment Agent

Table of Contents

Page

Article I DEFINITIONS AND ACCOUNTING TERMS .................................................................... 1
    Section 1.01.   Certain Defined Terms ................................................................ 1
    Section 1.02.   Interpretation .............................................................................. 18
    Section 1.03.   Computation of Time Periods ..................................................... 18
    Section 1.04.   Accounting Terms ....................................................................... 18

Article II AMOUNTS AND TERMS OF THE ADVANCES ............................................................ 18
    Section 2.01.   Term Loan Advances; Revolving Credit Advances .................... 18
    Section 2.02.   Making the Advances ................................................................. 18
    Section 2.03.   Fees ............................................................................................ 19
    Section 2.04.   Interest ....................................................................................... 20
    Section 2.05.   Evidence of Debt ........................................................................ 20
    Section 2.06.   Scheduled Repayment of Advances ........................................... 20
    Section 2.07.   Termination or Reduction of the Revolving Credit Commitments ...................... 21
    Section 2.08.   Optional Prepayments ................................................................ 21
    Section 2.09.   Mandatory Prepayments ............................................................. 21
    Section 2.10.   Increased Costs ........................................................................... 23
    Section 2.11.   Illegality .................................................................................... 24
    Section 2.12.   Payments and Computations ....................................................... 24
    Section 2.13.   Taxes ........................................................................................... 25
    Section 2.14.   Sharing of Payments, Etc. .......................................................... 26
    Section 2.15.   Use of Proceeds ......................................................................... 27
    Section 2.16.   Mitigation .................................................................................. 27

Article III CONDITIONS PRECEDENT TO LENDING ............................................................... 28
    Section 3.01.   Conditions Precedent on the Closing Date ................................. 28
    Section 3.02.   Conditions Precedent to Each Revolving Credit Advance Subsequent to the Closing Date ............................................................... 32
    Section 3.03.   Delivery Date Conditions Precedent ......................................... 33
    Section 3.04.   Conditions Subsequent to Closing Date ..................................... 35

Article IV REPRESENTATIONS AND WARRANTIES ................................................................ 35
    Section 4.01.   Representations and Warranties of the Borrower ...................... 35

Article V COVENANTS OF THE BORROWER ........................................................................... 39
    Section 5.01.   Affirmative Covenants ................................................................ 39
    Section 5.02.   Negative Covenants ................................................................... 45
    Section 5.03.   Reporting Requirements ............................................................. 49
    Section 5.04.   Financial Covenants ................................................................... 51

Article VI EVENTS OF DEFAULT ............................................................................................ 51
    Section 6.01.   Events of Default ........................................................................ 51
    Section 6.02.   Remedies .................................................................................... 53
    Section 6.03.   Application of Proceeds .............................................................. 53

Article VII the Administrative Agent ...................................................................................... 54
    Section 7.01.   Authorization and Action ........................................................... 54
    Section 7.02.   Agent's Reliance, Etc. ................................................................ 55

TEC000002

Section 7.03.   TEC and Affiliates ................................................................. 55
Section 7.04.   Lender Credit Decision ........................................................... 55
Section 7.05.   Indemnification ....................................................................... 56
Section 7.06.   Successor Administrative Agent ............................................ 56

Article VIII MISCELLANEOUS ................................................................................ 57
Section 8.01.   Amendments, Etc. .................................................................. 57
Section 8.02.   Notices, Etc. .......................................................................... 58
Section 8.03.   No Waiver; Remedies, Entire Agreement ............................. 59
Section 8.04.   Costs and Expenses ............................................................... 59
Section 8.05.   Right of Set-off ...................................................................... 61
Section 8.06.   Binding Effect; Assignment by Borrower .............................. 61
Section 8.07.   Assignments and Participations ............................................ 61
Section 8.08.   Execution in Counterparts ..................................................... 64
Section 8.09.   Confidentiality ....................................................................... 64
Section 8.10.   Release of Collateral ............................................................. 64
Section 8.11.   Patriot Act Notification ......................................................... 64
Section 8.12.   JURISDICTION, ETC. .......................................................... 65
Section 8.13.   GOVERNING LAW .............................................................. 65
Section 8.14.   WAIVER OF JURY TRIAL .................................................. 65
Section 8.15.   Process Agent ........................................................................ 65
Section 8.16.   Judgment Currency ............................................................... 66
Section 8.17.   Partial Invalidity .................................................................... 66

TEC000003

Schedules

| | | |
|---|---|---|
| Schedule I | - | Commitments |
| Schedule II | - | Applicable Lending Offices |
| Schedule III | - | [Reserved] |
| Schedule IV | - | Subsidiaries of each Loan Party |
| Schedule V | - | Existing Indebtedness; Guaranty Obligations |
| Schedule VI | - | Disclosed Litigation |
| Schedule VII | - | Certain Environmental Matters |

Exhibits

| | | |
|---|---|---|
| Exhibit A-1 | - | Form of Promissory Note for Term Loan Advance |
| Exhibit A-2 | - | Form of Promissory Note for Revolving Credit Advance |
| Exhibit B | - | Form of Notice of Borrowing |
| Exhibit C | - | Form of Assignment and Acceptance |
| Exhibit D | - | Form of Phantom Ownership Units Agreement |
| Exhibit E | - | Form of Guaranty |
| Exhibit F | - | Form of Account Pledge Agreement |
| Exhibit G | - | Form of Ship Mortgage |
| Exhibit H | - | Form of Assignment of Insurances |
| Exhibit I | - | Form of Assignment of Earnings |
| Exhibit J | - | Form of Stock Pledge |
| Exhibit K | - | Form of Security Trust Agreement |
| Exhibit L | - | Form of Certificate of Compliance |
| Exhibit M | - | Form of Borrowing Base Certificate |
| Exhibit N | - | Form of General Security Assignment |
| Exhibit O | - | Form of Capser Senior Limited Guaranty |
| Exhibit P | - | Form of Key Man Guaranty |
| Exhibit Q | - | Form of Pledge of Securities Portfolio |
| Exhibit R | - | Form of Deposit Account Control Agreement |
| Exhibit S | - | Form of Account Control Agreement (Bessemer Trust Company N.A.) |
| Exhibit T | - | Form of Assignment of Management Agreement |

TEC000004

SENIOR SECURED CREDIT FACILITY AGREEMENT

SENIOR SECURED CREDIT FACILITY AGREEMENT dated as of October 5, 2016 among (i) WAYFARE TRANSOCEANIC LLC. a Delaware limited liability company, as borrower (the "Borrower"), (ii) the banks, financial institutions and other institutional lenders (the "Initial Lenders") listed on the signature pages hereof, and (iii) THIRD EYE CAPITAL CORPORATION ("TEC"), as administrative agent, payment agent and collateral agent (together with any successor administrative agent, payment agent and collateral agent appointed pursuant to Article VII, the "Administrative Agent," which term shall include, as applicable, the "Payment Agent" or the "Collateral Agent") for the Secured Parties (as hereinafter defined).

PRELIMINARY STATEMENTS:

(1)     The Borrower has requested that the Lenders (as defined herein) lend to the Borrower certain amounts as provided under this Agreement to finance the Acquisition, to consummate the Bridge Notes Refinancing and to provide for ongoing working capital expenses and other general corporate purposes of the Wayfare Group.

(2)     Subject to the terms and conditions set forth herein, the Lenders agree to lend such amounts and extend such credit on the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

ARTICLE I

DEFINITIONS AND ACCOUNTING TERMS

Section 1.01.    Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Account Pledge Agreement" means (i) in respect of the Borrower, an account pledge agreement between the Borrower and the Administrative Agent, substantially in the form of Exhibit F hereto, together with appropriate notices and acknowledgments thereof , (ii) in respect of the Vessel Owing Subsidiaries, an account pledge agreement between the applicable Vessel Owing Subsidiary and the Administrative Agent, substantially in the form of Exhibit F hereto,  and (iii) in respect of Capser Senior, the Pledge of Securities Portfolio, substantially in the form of Exhibit Q hereto.

"Acquisition" means the acquisition by PTI One and PTI Two of the Collateral Vessels for a total purchase price not to exceed $40,800,000.

"Administrative Agent" has the meaning specified in the recital of parties to this Agreement.

"Administrative Agent's Account" means the account of the Administrative Agent maintained by the Administrative Agent at Royal Bank of Canada, 200 Bay Street, Main Floor, Toronto Ontario M5J 2J5, UID #0552353, Swift Code: ROYCCAT2, IBAN #

003000024084752-TECC In Trust Collection, Beneficiary's Name: Third Eye Capital Corporation In Trust Collection, Account No. 4084752, Branch #00002, Financial Institution # 003, through its correspondent bank JP Morgan Chase Bank, New York, Swift Code CHASUS33, ABA # 021000021, or such other account as the Administrative Agent shall specify in writing to the Lenders.

"Advance" means the Term Loan Advance or a Revolving Credit Advance.

"Affiliate" means, with respect to any Person, any Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, the term "control" (including the terms "controlling", "controlled by" and "under common control with") of a Person shall mean the power, direct or indirect, (i) to vote 20% or more of the securities or other interests having ordinary voting power for the election of directors of such Person or of Persons serving a similar function, or (ii) to direct or cause the direction of the management or policies of such Person, whether through the ability to exercise voting power, by contract or otherwise.

"Agreement" means this Senior Secured Credit Facility Agreement.

"Anti-Corruption Law" means any applicable anti-bribery or anti-corruption law or regulation applicable to any of the Loan Parties, or any charterer of a Collateral Vessel.

"Anti-Terrorism Law" means the US Patriot Act, the US Money Laundering Control Act of 1986 (18 USC sect. 1956), the US Executive Order No. 13224 on Terrorist Financing: Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism, issued 23 September 2001, as amended by Order 13268 (the "Executive Order") or any similar law enacted in the United States, Japan, the United Kingdom, any member nation of the European Union or the United Nations.

"Applicable Lending Office" means, with respect to any Lender, the office of such Lender specified as its "Applicable Lending Office" opposite its name on Schedule II hereto or in the Assignment and Acceptance pursuant to which it became a Lender, or such other office of such Lender as such Lender may from time to time specify to the Borrower and the Administrative Agent.

"Applicable Margin" means 10.00% per annum.

"Approved Broker" shall mean C.W. Kellock & Co. or any other entity that may from time to time be approved by the Administrative Agent in its sole discretion.

"Asset Disposition" has the meaning specified in Section 5.02(e).

"Assignment and Acceptance" means an assignment and acceptance entered into by a Lender and an Eligible Assignee, and accepted by the Administrative Agent, in substantially the form of Exhibit C hereto.

"Assignment of Charter" means an assignment of each existing or future time or bareboat charter or other similar contract for each Collateral Vessel, in each case that has as of the Execution Date a remaining term of four (4) months or greater, including any extension option, granted by the relevant Guarantor, together with appropriate notices and consents relating thereto, in substantially the form attached to the Assignment of Earnings.

TEC000006

"Assignment of Earnings" means an assignment of earnings covering the Collateral Vessels in favor of the Administrative Agent granted by the relevant Guarantors, together with appropriate notices and acknowledgments thereof, in substantially the form of Exhibit I hereto.

"Assignment of Insurances" means an assignment of insurances, together with appropriate notices thereof, consents thereto, and loss payable clauses satisfactory to the Administrative Agent, covering the Collateral Vessels in favor of the Administrative Agent granted by the Borrower and any Affiliate thereof that has an interest in such Collateral Vessel related insurances, in substantially the form of Exhibit H hereto.

"Assignment of Management Agreement" means collectively the assignment of each commercial or technical management agreement by the relevant Guarantors respecting a Collateral Vessel entered into during the term of this Agreement, together with appropriate notices and acknowledgments thereof, in substantially the form of Exhibit T hereto.

"Availability Date" means October 6, 2016 or such later date as the Administrative Agent may agree in writing.

Borrowing Base Certificate" means a certificate to be delivered by the Borrower to the Administrative Agent, on the Closing Date and thereafter the first Business Day of each calendar month (a) setting out satisfaction of the Borrowing Base Condition, (b) attaching charter documentation then in effect for each of the Collateral Vessels, (c) attaching a detailed calculation of Reserves, and (iv) providing such other information as may be reasonably requested by the Administrative Agent, in substantially the form of Exhibit M hereto.

"Borrowing Base Condition" means the requirement that, during the term of this Agreement, the aggregate principal amount of Revolving Credit Advances outstanding, at any time, shall not exceed, at any time, the lesser of (a) the Revolving Credit Notes Limit, and (b) the sum of (i) up to one hundred twenty (120) days of the aggregate Net Day Rate then in effect for the Collateral Vessels (ii) less the applicable Reserves.

"Borrowing Date" means the date set forth in the Notice of Borrowing that is a Business Day, on which the conditions precedent set forth in Sections 3.01, 3.02 and/or 3.03, as the case may be, are satisfied and an Advance is made to the Borrower.

"Bridge Notes Refinancing" means the refinancing of certain existing indebtedness of the Borrower in relation to the financing of the down payment for the Acquisition.

"Break Funding Costs" means, without duplication of any amounts due under the Make-Whole Premium, any loss, cost or expense and including loss of anticipated profit incurred by the Administrative Agent or any Lender whenever the Borrower makes any prepayment or repayment pursuant to this Agreement or under the Notes or under any other Loan Document on a date that is not an Interest Payment Date including, without limitation, any loss (including loss of anticipated profits) cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds by the Administrative Agent or such Lender by reason of receipt of a prepayment or repayment on a date that is not an Interest Payment Date.

"Business Day" means a day of the year on which banks are not required or authorized by law to close in Toronto, Canada, Billings, Montana and New York, New York.

TEC000007

"Capser Senior" means Edward Michael Capser, an individual resident of the State of Montana.

"Capser Senior Limited Guaranty" means the unconditional and limited guaranty executed by Capser Senior, up to a maximum amount of $22,000,000 with sole recourse to the Securities Portfolio, and related Pledge of Securities Portfolio, each in favor of the Administrative Agent, in substantially the form of Exhibit O hereto.

"Cash Equivalents" shall mean the following (all of which shall be freely disposable and, for the avoidance of doubt none of the following shall be deemed disqualified from being freely disposable by reason of being included in minimum liquidity calculations under this Agreement or other agreements respecting Indebtedness, or being subject to a Lien): (a) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed or insured by the United States Government or any agency thereof, (b) time deposits with maturities of one year or less from the date of acquisition and certificates of deposit with maturities of one year or less from the date of acquisition and overnight bank deposits of any commercial bank whose principal place of business is organized under the laws of any country that is a member of the Organization for Economic Cooperation and Development or has concluded special lending arrangements with the International Monetary Fund associated with its General Arrangements to Borrow, or a political subdivision of any such country, and having capital and surplus in excess of $200,000,000, (c) commercial paper of any issuer rated at least A-2 by Standard & Poor's Ratings Group or P-2 by Moody's Investors Service, Inc. with maturities of one year or less from the date of acquisition, (d) additional money market investments with maturities of one year or less from the date of acquisition rated at least A-1 or AA by Standard & Poor's Ratings Group or P-1 or Aa by Moody's Investors Service, Inc. and (e) tax-exempt debt obligations of any State of the United States or of any county or other municipal governmental subdivision of any State of the United States with maturities of one year or less from the date of acquisition rated at the highest investment grade rating by Standard & Poor's Ratings Group or by Moody's Investors Service, Inc., or publicly traded or open-end bond funds that invest exclusively in such tax-exempt debt obligations.

"Certificate of Compliance" means a certificate executed by the chief executive officer or chief financial officer of the Borrower in substantially the form of Exhibit L hereto.

"Change of Control" shall occur if (i) any "Person" or "Group" (within the meaning of Sections 13(d) and 14(d) under the Exchange Act, as in effect on the Closing Date), other than the Permitted Holders, is or shall be the "beneficial owner" (as so defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act) of 100% on a fully diluted basis of the voting interest in the Borrower's capital stock or other equity interests, and such percentage interest is greater than the percentage interest then held by the Permitted Holders in the aggregate, (ii) any "Person" or "Group" (within the meaning of Sections 13(d) and 14(d) under the Exchange Act, as in effect on the Closing Date), other than the Permitted Holders, shall have obtained the power (whether or not exercised) to elect a majority of the Borrower's directors, (iii) the Board of Directors of the Borrower shall cease to consist of a majority of Continuing Directors, (iv) the Permitted Holders shall cease to own beneficially on a fully diluted basis, in the aggregate, 51% of the voting control in the Borrower's capital stock or other equity interest, or (v) the adoption of a plan by the holders of capital stock relating to the liquidation or dissolution of the Borrower.

"Charter" means any of, and "Charters" means collectively all of, the PTI One Charter and the PTI Two Charter.

TEC000008

"Charter Parent Guarantee and Indemnity" means any of, and "Charter Parent Guarantees and Indemnity" means collectively all of, the PTI One Charter Parent Guarantee and Indemnity, and the PTI Two Charter Parent Guarantee and Indemnity.

"Charterer" means any of, and "Charterers" means collectively all of, the PTI One Charterer and the PTI Two Charterer.

"Charterer Parent" means Parakou Tankers Inc., a corporation organized and existing under the laws of the Republic of the Marshall Islands.

"Closing Date" means the date on which the preconditions set forth in Section 3.01 are satisfied and the initial Term Loan and Revolving Credit Advances are made, but not later than the Availability Date.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means the Collateral Vessels and all other property of the Borrower and the Guarantors securing the Obligations of any of the Loan Parties under any Loan Document.

"Collateral Documents" means the Guaranty, the Key Man Guaranty, the Capser Senior Limited Guaranty and related Pledge of Securities Portfolio, the Ship Mortgages, the Assignment of Earnings, the Assignment of Insurances, the Assignment of Charters from time to time, any Assignment of Management Agreement, each Account Pledge Agreement, any Manager's Undertakings, each Stock Pledge, the Security Trust Agreement, each Deposit Account Control Agreement, each General Security Assignment, and any other agreement that creates or purports to create a Lien in favor of the Administrative Agent (or the Security Trustee) for the benefit of the Secured Parties.

"Collateral Vessel" means either of, and "Collateral Vessels" means collectively, all of (i) the 51,215 dwt geared BV Class combined chemical and oil tanker known as M.T. SEXTANS, built in 2007 with IMO number 9358321, and (ii) the 51,218 dwt geared DNV-GL Class combined chemical and oil tanker known as M.T. CYGNUS, built in 2007 with IMO number 9354260, in each case, to be duly documented, in the name of the applicable Vessel Owing Subsidiary as owner, under the laws and flag of Hong Kong, or such other jurisdiction as is satisfactory to the Administrative Agent in its reasonable discretion.

"Commitment" means, with respect to any Lender at any time, the amount set forth opposite such Lender's name on Schedule I hereto under the captions "Revolving Credit Commitment", and "Term Loan Commitment" or, if such Lender has entered into one or more Assignments and Acceptances, set forth for such Lender in the Register maintained by the Administrative Agent pursuant to Section 8.07(c) as such Lender's "Revolving Credit Commitment" and "Term Loan Commitment"; provided that each Lender's Revolving Credit Commitment may be reduced from time to time in accordance with the terms of Section 2.07.

"Confidential Information" means information that any Loan Party furnishes to Administrative Agent or any Secured Party in a writing designated as confidential, but does not include any such information that is or becomes generally available to the public or that is or becomes available to the Administrative Agent or such Secured Party from a source other than the Loan Parties.

"Consolidated" refers to the consolidation of accounts in accordance with US GAAP.

TEC000009

"Consolidated EBITDA" means, for any accounting period, the Consolidated net income of the Borrower for that accounting period: (a) plus, to the extent deducted in computing the net income of the Borrower for that accounting period, the sum, without duplication, of (i) all federal, state, local and foreign income taxes and tax distributions; (ii) Consolidated Net Interest Expense; (iii) depreciation, depletion, amortization of intangibles and other non-cash losses (including non-cash transaction expenses and the amortization of debt discounts) and any extraordinary losses not incurred in the ordinary course of business; (iv) expenses incurred in connection with a special or intermediate survey (including any underwater survey done in lieu thereof) of a Collateral Vessel; and (v) any drydocking expenses; (b) minus, to the extent added in computing the Consolidated net income of the Issuer for that accounting period, (i) any non-cash income, non-cash gains and (ii) any extraordinary gains on asset sales not incurred in the ordinary course of business (it being understood that capital gains/losses from Vessel Dispositions should be included in the determination of Consolidated EBITDA); provided that Consolidated EBITDA shall be calculated on a rolling basis for the four fiscal quarters most recently ended.

"Consolidated Net Interest Expense" means the aggregate of all interest, commissions, discounts and other costs, charges or expenses accruing that are due from the Loan Parties during the relevant accounting period less (i) interest income received, and (ii) amortization of deferred charges and arrangement fees, determined on a Consolidated basis and as shown in the Consolidated statements of income for the Borrower.

"Continuing Directors" means the directors of the Borrower on August 10, 2016 and each other director if such director's nomination for election to the Board of Directors of the Borrower is recommended by a majority of the then Continuing Directors.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Default" means any Event of Default or any event that would constitute an Event of Default but for the requirement that notice be given or time elapse or both.

"Default Rate" has the meaning specified in Section 2.04(b).

"Delivery Date" means, in respect of each Collateral Vessel, the date of actual delivery by the applicable Seller of such Collateral Vessel to the relevant Vessel Owning Subsidiary in accordance with the terms of the relevant memorandum of agreement and as evidenced by a bill of sale and protocol of delivery and acceptance executed by the relevant Vessel Owning Subsidiary and the relevant Seller, and being for:

      (a) the Collateral Vessel known as M.T. CYGNUS, not later than the Termination Date, and

      (b) the Collateral Vessel known as M.T. SEXTANS, not later than the Termination Date.

"Deposit Account Control Agreement" means (i) in respect of the Borrower, a deposit account control agreement among the Depositary Bank, the Borrower and the Administrative Agent, including the consent of the Borrower to a standing instruction by the Administrative Agent, in substantially the form of Exhibit R hereto, (ii) in respect of the Vessel Owning Subsidiaries, a deposit account control agreement among the Depositary Bank, the applicable

TEC000010

Vessel Owing Subsidiary and the Administrative Agent, including the consent of the applicable Vessel Owing Subsidiary to a standing instruction by the Administrative Agent, in substantially the form of Exhibit R hereto,  and (iii) in respect of Capser Senior, a securities account control agreement over the Securities Portfolio among the Securities Intermediary, Capser Senior and the Administrative Agent, in substantially the form of Exhibit S hereto.

"Depositary Bank" means U.S. Bank National Association.

"Disclosed Litigation" means any action, suit, investigation, litigation or proceeding as more fully described in Schedule VI hereto.

"Dollars" and the "$" sign each means lawful money of the United States.

"Earnings Account" has the meaning set forth in Section 5.01(p).

"EBITDA" means the operating income plus the sum of (a) depreciation expense and (b) amortization expense, in each case, as reflected in the "Consolidated Statement of Operations" of the Borrower prepared  in accordance with US GAAP (it being understood that capital gains/losses from Vessel Dispositions should be included in the determination of revenue for the purposes of EBITDA); provided that EBITDA shall be calculated on a rolling basis for the four fiscal quarters most recently ended.

"Eligible Assignee" means (i) a Lender; (ii) a direct or indirect wholly owned Subsidiary of any Lender or of the controlling corporation of such Lender; and (iii) any commercial bank, financial institution or other institutional investor agreed to by the Administrative Agent.

"Environmental Action" means any action, suit, demand, demand letter, claim, notice of non-compliance or violation, notice of liability or potential liability, investigation, proceeding, consent order or consent agreement relating in any way to any Environmental Law, Environmental Permit or Hazardous Materials or arising from alleged injury or threat of injury to public health, public safety (as such alleged injury or threat of injury to public health or public safety is related to exposure to Hazardous Materials) or the environment, including, without limitation, (a) by any governmental or regulatory authority for enforcement, cleanup, removal, response, remedial or other actions or damages and (b) by any governmental or regulatory authority or any third party for damages, contribution, indemnification, cost recovery, compensation or injunctive relief.

"Environmental Law" means any statute, law, ordinance, rule, regulation, code, order, writ, judgment, injunction, decree or judicial or agency interpretation, policy or guidance relating to pollution or protection of the environment, health (as it is related to exposure to Hazardous Materials), safety (as it is related to exposure to Hazardous Materials) or natural resources, including, without limitation, those relating to the use, handling, transportation, treatment, storage, disposal, release or discharge of Hazardous Materials.

"Environmental Permit" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"Equity Interests" means, with respect to any Person, shares of equity interests of (or of membership interests or other ownership or profit interests in) such Person, warrants, options or other rights for the purchase or other acquisition from such Person of shares of equity interests of (or of membership interests or other ownership or profit interests in) such Person, securities convertible into or exchangeable for shares of equity interests of (or of membership interests or

TEC000011

other ownership or profit interests in) such Person or warrants, rights or options for the purchase or other acquisition from such Person of such shares (or of membership interests or such other interests), and other ownership or profit interests in such Person (including, without limitation, partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are authorized or otherwise existing on any date of determination.

"Equity Paydown" means the proceeds of an equity financing (which Borrower anticipates will be from The Joshua Green Corporation or another bona fide investment firm) or the sale of the Securities Portfolio by Capser Senior.

"ERISA" means the United States Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means, with respect to any Person, any trade or business (whether or not incorporated) that, together with such Person, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of potential liability pursuant to Section 302(b)(2) of ERISA and Section 412(b)(2) of the Code, under Section 414(m) or (o) of the Code.

"Events of Default" has the meaning specified in Section 6.01.

"Exchange Act" means the United States Securities Exchange Act of 1934, as amended.

"Excluded Taxes" means, with respect to the Administrative Agent or any Lender, Taxes (however denominated) on or based on its overall net income imposed by any Governmental Authority of or in the jurisdiction under the laws of which such recipient is incorporated or otherwise organized or in which its principal office is located or (in the case of any Lender) in which its Applicable Lending Office is located.

"Execution Date" means the date of this Agreement as set forth on the cover page hereof.

"Facility" and "Facilities" means collectively the Revolving Credit Facility and the Term Loan Facility.

"Fair Market Value" of a Collateral Vessel at any time shall be the appraised value obtained from an Approved Broker and determined on the basis of a charter-free arm's-length transaction between a willing and able buyer and seller not under duress.   The Fair Market Value of any Collateral Vessel that is a Total Loss shall be zero.

"Fair Market Value Coverage Ratio" has the meaning set forth in Section 5.04(d).

"Financing Lease" means any lease of property, real or personal, the obligations of the lessee in respect of which are required in accordance with US GAAP to be capitalized on a balance sheet of the lessee.

"Funding Rate" means, for any period, a fluctuating interest rate per annum equal for each day during such period to the Prime Rate.

"General Security Assignment" means a Security Assignment covering, inter alia, all of the Wayfare Group's present and future real and personal property, in favor of the Administrative Agent granted by the relevant Obligors, in substantially the form of Exhibit N hereto.

TEC000012

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization.

"Governmental Authorization" means any authorization, approval, consent, franchise, license, covenant, order, ruling, permit, certification, exemption, notice, declaration or similar right, undertaking or other action of, to or by, or any filing, qualification or registration with, any Governmental Authority.

"Guarantor" means each of (i) WSO, (ii) PTI One, (iii) PTI Two, (iv) the Key Man, (v) Capser Senior (vi) each  direct or indirect Subsidiary of the Borrower that (A) holds at any time an ownership interest in one or more of the Collateral Vessels (a "Vessel Owning Subsidiary") or (B) directly or indirectly owns shares, a membership or any other equity interest in any Vessel Owning Subsidiary, and (vii) each party that becomes a party to the Guaranty pursuant to the terms hereof and thereof.

"Guaranty" means the Guaranty executed by the Guarantors (other than the Parent Guarantors) on the Closing Date in substantially the form of Exhibit E hereto.

"Guaranty Obligation" means, as to any Person (the "guaranteeing person"), any obligation of (i) the guaranteeing person or (ii) another Person (including, without limitation, any bank under any letter of credit) to induce the creation of which the guaranteeing person has issued a reimbursement, counterindemnity or similar obligation, in either case if such obligation is guaranteeing or in effect guaranteeing any Indebtedness, or leases, dividends or other obligations which are substitutes for or equivalents of Indebtedness (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of the guaranteeing person, whether or not contingent, (A) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (B) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (C) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (D) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guaranty Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business.  The amount of any Guaranty Obligation of any guaranteeing person shall be deemed to be the lower of (x) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guaranty Obligation is made and (y) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guaranty Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guaranty Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrower in good faith.

"Hazardous Materials" means (a) petroleum and petroleum products, byproducts or breakdown products, radioactive materials, asbestos-containing materials, polychlorinated biphenyls and radon gas and (b) any other chemicals, materials or substances designated, classified or regulated as hazardous or toxic or as a pollutant or contaminant under any Environmental Law.

TEC000013

"Hong Kong" means the Hong Kong Special Administrative Region of the People's Republic of China.

"IMO" means the International Maritime Organization.

"Indebtedness" of any Person at any date means, without duplication, (a) all indebtedness of such Person for borrowed money (other than current trade liabilities, customer advances and customer deposits incurred in the ordinary course of business and payable in accordance with customary practices) or which is evidenced by a note, bond, debenture or similar instrument, (b) the portion of the obligations of such Person under Financing Leases included as indebtedness on the balance sheet of such Person in accordance with US GAAP, (c) the portion of the obligations of such Person in respect of acceptances issued or created for the account of such Person included as indebtedness on the balance sheet of such Person in accordance with US GAAP, and (d) all reimbursement or counter indemnity obligations of such Person in respect of amounts already paid under letters of credit, guarantees or similar instruments backing another Person's obligations of the types described in the foregoing clauses (a), (b), (c) and (d).

"Indemnified Taxes" means, with respect to the Administrative Agent or any Lender or any other Secured Party, all Taxes other than Taxes that are Excluded Taxes with respect to it.

"Initial Lenders" has the meaning specified in the preamble to this Agreement.

"Initial Term Loan Repayment Amount" has the meaning given to it in Section 2.06 hereof.

"Inter Company Charter" means in respect of any Collateral Vessel, any bareboat, time or other charter between a Loan Party and another Loan Party or Affiliate thereof.

"Interest Payment Date" means (a) with respect to any Advance, the last day of each Interest Period applicable to such Advance, and in the case of an Advance with an Interest Period that extends, for any reason, beyond one month's duration, each day that would have been an Interest Payment Date had successive Interest Periods of one month duration been applicable thereto and (b) with respect for each Advance then outstanding, the Maturity Date.

"Interest Period" means, subject to Section 2.04(a), for any Advance or combination thereof, the period commencing on the date of such Advance and ending on the last day of the calendar month in which such Advance occurs and, thereafter, each subsequent period commencing on the last day of the immediately preceding Interest Period and ending on the last day of such calendar month; provided, however, that whenever the last day of any Interest Period would otherwise occur on a day other than a Business Day, the last day of such Interest Period shall occur on the next preceding Business Day.

"Internal Revenue Code" means the United States Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"ISM Code" means the International Management Code for the Safe Operation of Ships and for Pollution Prevention as adopted by the IMO, as the same may be amended from time to time.

"Key Man" means Todd Michael Capser, an individual resident in Billings, Montana.

TEC000014

"Key Man Guarantee" means the unconditional and unlimited guarantee executed by the Key Man in favor of the Administrative Agent, in substantially the form of Exhibit P hereto.

"Key Man Life Insurance" means the policy of life insurance issued by the Life Insurer in the amount of $2,000,000 covering the life of the Key Man and naming TEC as additional insured.

"Lenders" means the Initial Lenders and each Person that shall become a party hereto in accordance with the terms of Section 8.07.

"Life Insurer" means Farmers Insurance.

"Lien" means any lien, security interest or other charge or encumbrance of any kind, including, without limitation, the lien or retained security title of a conditional vendor.

"Loan Documents" means this Agreement, the Notes, the POU Agreement and the Collateral Documents.

"Loan Party" means any of and "Loan Parties" means, collectively, the Borrower and each Guarantor.

"Majority Lenders" means at any time Lenders owed or holding greater than 66 2/3% of the sum of the aggregate principal amount of the Advances and undrawn Commitments outstanding at such time.

"Make-Whole Premium" means, the interest and fees due to the Administrative Agent or the Lenders on any portion of the Term Loan Advances repaid prior to the first anniversary of the Closing Date, as if the repaid portion were outstanding for the entire year.

"Manager" means Parakou Ship Management Pte Ltd, a company organized and existing under the laws of Singapore, or such other Person appointed with the prior written consent of the Administrative Agent as provided in Section 5.01(n)(ii).

"Manager's Undertakings" means the undertakings, provided by a Manager respecting each Collateral Vessel, including, inter alia, a statement satisfactory to the Administrative Agent that any lien in favor of such Manager respecting a Collateral Vessel is subject and subordinate to the Ship Mortgages.

"Mandatory Partial Prepayment Event" has the meaning set forth in Section 2.09(f) hereof.

"Material Adverse Effect" means the existence of one or more events, conditions, circumstances and/or contingencies that the Administrative Agent, acting reasonably, shall determine have had, or could reasonably be expected to have, a materially adverse effect (w) on the rights or remedies of the Secured Parties, or (x) the ability of an Obligor to perform its obligations to the Secured Parties under the Loan Documents, or (y) on the property, assets, nature of assets, business, results of operations, prospects, performance, operations, liabilities or financial condition or otherwise of the Borrower and/or its Affiliates taken as a whole.

"Maturity Date" means the day preceding eighteenth (18th) monthly anniversary of the Closing Date.

TEC000015

"Monitoring Fee" has the meaning set forth in Section 2.03(a).

"Net Day Rate" means, in relation to a Collateral Vessel, (i) the day hire rate under the applicable Charter then in effect for such Collateral Vessel less (ii) any applicable technical manager day hire rate in effect for such Collateral Vessel, or in respect of a bareboat charter, the applicable day hire rate in effect for such Collateral Vessel.

"Net Proceeds" means the proceeds of the sale of equity or debt interests reduced by issuance fees and commissions such as underwriters' or lenders' fees.

"Note" means a promissory note of the Borrower payable to a Lender in substantially the forms of Exhibit A-1 hereto respecting such Lender's Term Loan Commitment and A-2 hereto respecting such Lender's Revolving Credit Commitment, evidencing the Advances made and to be made by such Lender, in each case as further set forth in Section 2.05 hereof.

"Notice of Borrowing" has the meaning specified in Section 2.02(a).

"Obligations" means, with respect to any Person, any payment, performance or other obligation of such Person of any kind, including, without limitation, any liability of such Person on any claim, whether or not the right of any creditor to payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured or unsecured, and whether or not such claim is discharged, stayed or otherwise affected by any proceeding referred to in Section 6.01(f).

Without limiting the generality of the foregoing, the Obligations of any Loan Party under the Loan Documents include (a) the obligation to pay principal, interest (including interest accruing on or after the filing of any petition in bankruptcy or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower or any other Loan Party, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), charges, expenses, fees, attorneys' fees and disbursements, indemnities, and other amounts payable by such Loan Party under any Loan Document and the performance by each such Loan Party of its respective obligations under any Loan Document, and (b) the obligation of such Loan Party to reimburse any amount in respect of any of the foregoing that any Lender, in its sole discretion, may elect to pay or advance on behalf of such Loan Party.

"Obligor" means any of, and "Obligors" means collectively all of, the Wayfare Group, the Key Man and Capser Senior.

"Offer" has the meaning set forth in Section 5.01(t).

"Offer Notice" has the meaning set forth in Section 5.01(t).

"Other Taxes" means any and all present or future stamp, documentary, recording, filing, mortgage, intangible, excise or property Taxes or similar Taxes arising from any payment made under this Agreement or any other Loan Document or from the execution, delivery, filing, registration, recording, performance or enforcement of, or the receipt or perfection of a security interest under, or otherwise with respect to, this Agreement or any other Loan Document.

"Parent Guarantor" means either of, and "Parent Guarantors" means collectively both, the Key Man and Capser Senior.

TEC000016

"Patriot Act" has the meaning set forth in Section 8.11.

"PBGC" means the United States Pension Benefit Guaranty Corporation (or any successor).

"Permitted Holders" shall mean collectively, Todd Casper and (A) each of his spouse, parents, siblings, family members (including adopted children), lineal descendants, spouses of their lineal descendants and adopted children and/or (B) the heirs, executors, administrators, testamentary trustees and legatees and/or (C) any foundation controlled by any of the foregoing Persons, any trusts for the benefit of any of the foregoing Persons, any corporations controlled by the foregoing Persons and any Affiliates of the foregoing Persons.

"Permitted Lien" has the meaning set forth in Section 5.02(b)(iii) hereof.

"Person" means an individual, partnership, corporation (including a business trust), joint stock company, trust, unincorporated association, joint venture, limited liability company or other entity of whatever nature, or a Governmental Authority.

"Plan" means any employee pension benefit plan subject to the provisions of Section 302 or Title IV of ERISA or Section 412 of the Code and in respect of which any Loan Party or any of its ERISA Affiliates is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Pledge of Securities Portfolio" means the pledge agreement executed by Capser Senior in favor of the Administrative Agent, substantially in the form of Exhibit Q hereto.

"POU Agreement" means the Phantom Ownership Units Agreement entered into between the Borrower and the Administrative Agent, in substantially the form of Exhibit D hereto.

"Prime Rate" means, as at any date of determination, the rate of interest per annum most recently published by Bloomberg L.P. (or if unavailable, The Wall Street Journal) as the "prime rate" in effect for commercial loans in the United States.

"Pro Rata Share" of any amount means, with respect to any Lender at any time, the product of such amount multiplied by a fraction the numerator of which is the amount of such Lender's Commitment at such time and the denominator of which is the aggregate of all Lender Commitments at such time.

"PTI One" means Wayfare PTI One Inc, a corporation organized and existing under the laws of the Republic of the Marshall Islands, a direct Wholly Owned Subsidiary of WSO and the owner of the Collateral Vessel known as M.T. CYGNUS.

"PTI One Charter" means the bareboat charter of the Collateral Vessel known as M.T. CYGNUS dated August 18, 2016, between PTI One, as owner, and PTI One Charterer, as charterer.

"PTI One Charter Parent Guarantee and Indemnity" means the guarantee dated August 18, 2016 and granted by the Charterer Parent in favor of the Borrower in respect of the obligations of the PTI One Charterer under the PTI One Charter, to be assigned by the Borrower in favor of the Administrative Agent.

PTI One Charterer" means Pretty View Shipping S.A., an Affiliate of the Charterer Parent.

TEC000017

"PTI Two" means Wayfare PTI Two Inc, a corporation organized and existing under the laws of the Republic of the Marshall Islands, a direct Wholly Owned Subsidiary of WSO and the owner of the Collateral Vessel known as M.T. SEXTANS.

"PTI Two Charter" means the bareboat charter of the Collateral Vessel known as M.T. SEXTANS dated August 18, 2016, between PTI Two, as owner, and PTI Two Charterer, as charterer.

"PTI Two Charter Parent Guarantee and Indemnity " means the guarantee dated August 18, 2016 and granted by the Charterer Parent in favor of the Borrower in respect of the obligations of the PTI Two Charterer under the PTI Two Charter, to be assigned by the Borrower in favor of the Administrative Agent.

"PTI Two Charterer" means Pretty Urban Shipping S.A., an Affiliate of the Charterer Parent.

"Register" has the meaning specified in Section 8.07(c).

"Related Party Lender" means any creditor of, or holder of equity in (including a Permitted Holder), the Borrower or a Guarantor who is (i) an Affiliate of either the Borrower or such Guarantor, or (ii) related, by blood or marriage within the third degree, to any senior officer or manager of either the Borrower or such Guarantor.

"Regulation U" means Regulation U of the Board of Governors of the United States Federal Reserve System.

"Requirement of Law" means as to any Person, the certificate of incorporation and by-laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Requisition Compensation" means all compensation or other money which may from time to time be payable to a Vessel Owning Subsidiary as a result of a Collateral Vessel being requisitioned for title or in any other way compulsorily acquired (other than by way of requisition for hire).

"Reserves" means, in relation to the Borrowing Base Condition, any Dollar cash or cash equivalent reserves as the Administrative Agent from time to time determines in its discretion as being appropriate to reflect (a) any impediments to the Administrative Agent's ability to realize upon the Collateral, (b) claims and liabilities that the Administrative Agent determines will need to be satisfied in connection with the realization upon the Collateral, or (c) criteria, events, conditions, contingencies or risks which adversely affect any of the Collateral.

"Responsible Officer" means the chief executive officer of the Borrower, the president of the Borrower, the general counsel of the Borrower, any senior vice president of the Borrower or any corporate vice president of the Borrower having familiarity with the matters in respect of which such corporate vice president is acting as a Responsible Officer under this Agreement, or, with respect to financial matters, the chief financial officer of the Borrower, the treasurer of the Borrower or the chief accounting officer of the Borrower.

TEC000018

"Revolving Credit Advance" means an Advance made by any Lender pursuant to Section 2.01(b).

"Revolving Credit Commitment" means in the aggregate the amount of up to one million three hundred seventy five thousand dollars ($1,375,000), and with respect to any Lender at any time, the amount set forth opposite such Lender's name on Schedule I hereto under the caption "Revolving Credit Commitment" or, if such Lender has entered into one or more Assignments and Acceptances, set forth for such Lender in the Register maintained by the Administrative Agent pursuant to Section 8.07(c) as such Lender's "Revolving Credit Commitment"; provided that each Lender's Revolving Credit Commitment may be reduced from time to time in accordance with the terms of Section 2.07.

"Revolving Credit Facility" means the facility made available to the Borrower in accordance with the terms of Section 2.01(b).

"Revolving Credit Notes Average Outstanding" means the average daily indebtedness outstanding under the Revolving Credit Advances.

"Revolving Credit Notes Limit" means the aggregate Revolving Credit Commitment in the amount of one million three hundred seventy five thousand dollars ($1,375,000).

"Sale Price" has the meaning specified in Section 3.01.

"Sanctions" means all export control and economic sanctions laws and regulations that are applicable to the Loan Parties, the Charterers, the Loan Parties' shareholders, the Loan Parties' lenders, and the Collateral Vessels, including without limitation: all export control or sanctions laws imposed by the UN Security Council, the European Union, the United States, and Canada.

"Sanctions Target" means any individual, firm, company, corporation or any association, trust, joint venture, consortium or partnership (whether or not having separate legal personality) which is the target of any Sanctions or which is owned controlled by any individual, firm, company, corporation or any association, trust, joint venture, consortium or partnership (whether or not having separate legal personality) which is the target of any Sanctions; "owned or controlled" shall have the meaning as defined in applicable Sanctions.

"SEC" means the United States Securities and Exchange Commission.

"Secured Parties" means the Administrative Agent, the Collateral Agent, the Security Trustee, the Payment Agent and the Lenders.

"Securities Intermediary" means Bessemer Trust Company N.A.

"Securities Portfolio" means the portfolio of publicly traded securities owned by Capser Senior and held with the Securities Intermediary under reference account number INVBQ7 Edward Michael Capser.

"Security Trust Agreement" means the Security Trust Agreement dated as of the Closing Date between the Administrative Agent and TEC whereby TEC agrees to act as Security Trustee on behalf of the Secured Parties with respect to holding the Ship Mortgages, in substantially the form of Exhibit K hereto.

TEC000019

"Security Trustee" means TEC in its capacity as security trustee under the Security Trust Agreement.

"Seller" means in respect of the Collateral Vessel known as M.T. CYGNUS, the PTI One Charterer, and in respect of the Collateral Vessel known as M.T. SEXTANS, the PTI Two Charterer.

"Ship Mortgage" means, with respect to each of the Hong Kong flag Collateral Vessels, a first priority statutory mortgage and the related deed of covenants in favor of the Security Trustee, in substantially the form of Exhibit G hereto.

"Solvent" means, with respect to any Person on a particular date, that on such date (a) the present fair salable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (b) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay as such debts and liabilities mature and (c) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would be unreasonably small in relation to such business or such transaction.

"Standby Fee" has the meaning set forth in Section 2.03(b).

"Stock Pledge" means any of and "Stock Pledges" means all of the pledges of shares (or membership interests as the case may be) in members of the Wayfare Group by the respective owners thereof together with appropriate irrevocable proxies, undated stock or interest powers, delivery to the Administrative Agent of the share or membership interest certificates, and undated resignations of all directors and officers of all entities the shares or membership interests of which are pledged, in substantially the form of Exhibit J hereto, together with appropriate notices thereof.

"Subsidiary" of any Person means any corporation, partnership, joint venture, limited liability company, trust or estate or other entity of which (or in which) more than 50% of (a) the issued and outstanding Equity Interests or other ownership interests having ordinary voting power to elect a majority of the board of directors or a majority of other equivalent managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person (irrespective of whether at the time Equity Interests of any other class or classes of such corporation shall or might have voting power upon the occurrence of any contingency), or (b) the interest in the capital or profits of such limited liability company, partnership or joint venture, or (c) the beneficial interest in such trust or estate, is at the time directly or indirectly owned or controlled by such Person, by such Person and one or more of its other Subsidiaries or by one or more of such Person's other Subsidiaries.

"Taxes" means any and all present or future taxes (including, but not limited to, gross receipts, gross or net income, capital, license, franchise, doing business, occupational, sales, turnover, use, consumption, ad valorem, value added, goods and services, recording, and registration taxes), levies, imposts, duties, assessments, deductions, withholdings, fees and other charges imposed by any Governmental Authority or other taxing authority or by any international taxing or regulatory authority (and any and all penalties, fines and interest relating thereto and other additions thereto).

"TEC" has the meaning specified in the recital of parties to this Agreement.

TEC000020

"Term Loan" and "Term Loan Advance" each means the aggregate amount of the term loan tranches advanced by the Lenders to the Borrower under Section 2.01(a) in the aggregate amount of up to forty one million nine hundred twenty five thousand dollars ($41,925,000).

"Term Loan Commitment" means with respect to any Lender at any time, the amount set forth opposite such Lender's name on Schedule I hereto under the caption "Term Loan Commitment" or, if such Lender has entered into one or more Assignments and Acceptances, set forth for such Lender in the Register maintained by the Administrative Agent pursuant to Section 8.07(c) as such Lender's "Term Loan Commitment."

"Term Loan Facility" means the facility made available to the Borrower in accordance with the terms of Section 2.01(a).

"Term Loan Repayment Amount" has the meaning given to it in Section 2.06 hereof.

"Termination Date" means October 21, 2016, or if the Term Loan is drawn down and the Acquisition is consummated on or prior to October 21, 2016, "Termination Date" shall mean the earlier of (i) the date on which all amounts due hereunder or under any other Loan Document to any Secured Party are paid in full and the Commitments hereunder are terminated, and (ii) the Maturity Date.

"Total Commitment" means the aggregate Revolving Credit Commitments and Term Loan Commitments.

"Total Loss" has the meaning set forth in Section 1.15(d)(iv) of the deed of covenants to the relevant Ship Mortgage.

"Transaction" shall mean collectively the Acquisition and the other transactions contemplated hereby.

"Unused Commitment" means, at any time, (a) the aggregate Lenders' Revolving Credit Commitment at such time minus (b) the aggregate principal amount of all Revolving Credit Advances made by the Lenders and outstanding at such time.

"US GAAP" has the meaning specified in Section 1.04.

"Vessel Disposition" means an Asset Disposition respecting any Collateral Vessel as defined in Section 5.02(e)(ii).

"Vessel Owning Subsidiary" has the meaning described in the definition of "Guarantor."

"Wayfare Group" shall mean, collectively, WSO, the Borrower, PTI One, PTI Two and any existing or future Subsidiaries, joint ventures or Affiliates of the Borrower, which the Administrative Agent deems material in its sole discretion.

"Wholly Owned Subsidiary" means any Subsidiary of the Borrower, all of the outstanding Equity Interests in which are owned, directly or indirectly, by the Borrower.

"WSO" means Wayfare Shipping & Offshore Ltd., a corporation organized and existing under the laws of the Republic of the Marshall Islands and a direct Wholly Owned Subsidiary of the Borrower.

TEC000021

"WTC" means Wayfare Transportation Company, Inc., a corporation organized and existing under the laws of the State of Montana, United States, wholly-owned by the Key Man.

Section 1.02.    Interpretation.  (a)  All documents and instruments defined herein, or by reference herein, shall mean such documents and instruments as originally executed and delivered, as the same may be amended, supplemented, modified, changed or restated from time to time in accordance with the terms hereof, except where otherwise noted herein.

(b)    All statutes, laws and regulations defined herein, or referenced herein, shall mean such statutes, laws and regulations as amended or re-enacted from time to time.

Section 1.03.    Computation of Time Periods.  In this Agreement in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding".

Section 1.04.    Accounting Terms.  All accounting terms not specifically defined herein shall be construed in accordance with generally accepted accounting principles from time to time in effect in the United States ("US GAAP").

## ARTICLE II

## AMOUNTS AND TERMS OF THE ADVANCES

Section 2.01.    Term Loan Advances; Revolving Credit Advances.  (a)  The aggregate amount of the Term Loan shall be advanced to the Borrower in one lump sum on the Closing Date.  Each Lender severally agrees to make its Term Loan Commitment available by an advance (the "Term Loan Advance") to the Borrower on the Closing Date in Dollars in a principal amount not to exceed its Term Loan Commitment; provided, however, that any Term Loan Commitment undrawn on the Closing Date or the Termination Date (whichever occurs first) shall be cancelled and that no amount of the Term Loan Advance once repaid or prepaid may be re-borrowed.

(b)    Each Lender severally agrees, on the terms and conditions hereinafter set forth, to make advances (each a "Revolving Credit Advance") to the Borrower from time to time on any Business Day during the period from the Closing Date until the Termination Date; provided that with respect to any requested Revolving Credit Advance, the amount of such Revolving Credit Advance does not exceed either such Lender's Unused Commitment at such time or such Lender's Pro Rata Share of all Revolving Credit Advances, and provided further that the Borrower may draw only one (1) Revolving Credit Advance per week.  Each Revolving Credit Advance shall be in the aggregate amount of $100,000 or an integral multiple of $10,000 in excess thereof.  Lenders shall participate in each aggregate Revolving Credit Advance ratably according to their respective Revolving Credit Commitments.  Within the limits of each Lender's Unused Commitment and subject to the terms of Section 3.02 hereof, the Borrower may borrow Revolving Credit Advances under this Section 2.01(b), prepay in accordance with the terms of Section 2.08 and re-borrow under this Section 2.01(b).

Section 2.02.    Making the Advances.  (a)  Each Advance shall be made on notice given by the Borrower to the Administrative Agent not later than 1:00 P.M. (Toronto time) on the fifth (5th) Business Day prior to the date of the proposed Advance, and the Administrative Agent shall give to each Lender prompt notice thereof.  Each such notice of an Advance (a "Notice of Borrowing") shall be by telecopier, in substantially the form of Exhibit B hereto, specifying therein (i) the requested date of such Advance, (ii) the requested aggregate amount of such Advance and the amounts that constitute as applicable the Term Loan Advance and the Revolving Credit Advance, (iii) each Lender's pro rata share of each requested Advance, and (iv) the requested initial Interest Periods for each such Advance.  Each Lender shall, before

TEC000022

3:00 P.M. (Toronto time) on the date of such Advance, make available for the account of its Applicable Lending Office to the Administrative Agent at either the Administrative Agent's Account or a suspense or escrow account controlled by the Administrative Agent to be advised by the Administrative Agent, in same day funds, such Lender's ratable portion of such Advance.  After the Administrative Agent's receipt of such funds and upon fulfillment of the applicable conditions set forth in Article III, the Administrative Agent will make such funds available to the Borrower at the Administrative Agent's address referred to in Section 8.02.

(b)     Each Notice of Borrowing shall be irrevocable and binding on the Borrower. The Borrower shall indemnify each Lender against any loss, cost or expense incurred by such Lender as a result of any failure to fulfill on or before the date specified in such Notice of Borrowing for such Advance the applicable conditions set forth in Article III, including, without limitation, any loss (including loss of anticipated profits), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by such Lender to fund the Advance to be made by such Lender when such Advance, as a result of such failure, is not made on such date.

(c)     Unless the Administrative Agent shall have received notice from a Lender prior to the date on which any Advance is to be made that such Lender will not make available to the Administrative Agent such Lender's ratable portion of such Advance, the Administrative Agent may assume that such Lender has made such portion available to the Administrative Agent on the date of such Advance in accordance with subsection (a) of this Section 2.02, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount.  If and to the extent that such Lender shall not have so made such ratable portion available to the Administrative Agent, such Lender and the Borrower severally agree to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available by the Administrative Agent to the Borrower until the date such amount is repaid to the Administrative Agent, at (i) in the case of the Borrower, the interest rate applicable at the time to the other Advances extended on the same date and (ii) in the case of such Lender, at the Funding Rate.  If such Lender shall repay to the Administrative Agent such corresponding amount, such amount so repaid shall constitute part of such Lender's Advance for purposes of this Agreement.

(d)     The failure of any Lender to make the Advance to be made by it shall not relieve any other Lender of its obligation, if any, hereunder to make its Advance on the requisite Advance date, but no Lender shall be responsible for the failure of any other Lender to make the Advance to be made by such other Lender on such date.

Section 2.03.   Fees.  (a) Monitoring Fee.  The Borrower shall pay to the Administrative Agent for its own account a monthly monitoring fee in the amount of US$10,000 per month (the "Monitoring Fee") payable in arrears on each Interest Payment Date, commencing on the first Interest Payment Date in a pro-rata amount based on the number of days from the Borrowing Date to the first Interest Payment Date, and ending on the Termination Date in a prorated amount based on the number of days from the immediately preceding Interest Payment Date to and including the Termination Date.

(b)     Standby Fee.  The Borrower shall pay to the Administrative Agent for the ratable benefit of the Lenders a monthly standby fee in the amount equal to the sum of 2.00% of the difference between the Revolving Credit Notes Average Outstanding and the Revolving Credit Notes Limit (the "Standby Fee") payable in arrears on each Interest Payment Date, commencing on the first Interest Payment Date in a pro-rata amount based on the number of days from the Borrowing Date to the first Interest Payment Date, and ending on the Termination Date in a prorated amount based on the number of days from the immediately preceding Interest Payment Date to and including the Termination Date.

TEC000023

Section 2.04.   Interest. (a) Scheduled Interest. The Borrower shall pay interest on the unpaid principal amount of each Advance owing to each Lender from the date the relevant Advance is made until such principal amount shall be paid in full, at the following rates per annum:

> (i)   for the Term Loan Advance, a rate per annum at all times during each Interest Period equal to twelve percent (12%) per annum, compounded monthly. Interest shall be payable monthly, in arrears, on each Interest Payment Date; and

> (ii)   for Revolving Credit Advances, a rate per annum at all times during each Interest Period equal to 12% or, if greater, the sum of (x) the Applicable Margin, plus (y) the Prime Rate in effect from time to time, as determined by the Administrative Agent, adjusted on the Business Day following the date of a change in the Prime Rate. Interest shall be payable monthly, in arrears, on each Interest Payment Date.

> (b)   Default Interest. If any amount payable under any Loan Document is not paid on the due date thereof, the Borrower shall pay interest on such overdue amount, payable on demand, at a rate per annum ("Default Rate") equal at all times to 10% per annum above the rate per annum calculated in accordance with clause (a)(i) or (a)(ii) of Section 2.04 above, as applicable.

Section 2.05.   Evidence of Debt (a)   Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrower to such Lender resulting from each Advance made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

> (b)   The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Advance made hereunder and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) any amount received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

> (c)   The entries made in the accounts maintained pursuant to paragraph (a) and (b) of this Section 2.05 shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Facility in accordance with the terms of this Agreement.

> (d)   In addition to the foregoing, the maximum Term Loan Commitment of each Lender, shall be evidenced by a promissory note payable to such Lender, substantially in the form of Exhibit A-1 (a "Term Note"), and the maximum Revolving Loan Commitment of each Lender, at the request of such Lender, may be evidenced by a promissory note substantially in the form of Exhibit A-2 (a "Revolving Note"). All Notes initially shall be dated as of the Closing Date and may be replaced in accordance with the terms of Section 5.01(w) and Section 8.07(d).

Section 2.06.   Scheduled Repayment of Advances. (a)   Term Loan Advance. On the anniversary of the Closing Date, the Borrower shall repay the outstanding principal of the Term Loan in the aggregate principal amount of (i) $22,500,000 plus (ii) the amount, if any, by which the resulting principal amount then outstanding under the Term Loan exceeds 70% of the Fair Market Value of the Collateral Vessels, plus (iii) accrued and unpaid interest and fees, less (iv) the amount, if any, of any prepayment of Term Loan principal made in accordance with Section 2.09(h) therein defined as a Designated Term Loan Prepayment (such amount, the "Initial Term Loan Repayment Amount"). On the Maturity Date, the

TEC000024

Borrower shall repay the outstanding principal balance of the Term Loan, together with accrued and unpaid interest and fees (such amount together with the Initial Term Loan Repayment Amount, each, a "Term Loan Repayment Amount"). Upon payment of the Initial Term Loan Repayment Amount in accordance with the terms of this Section 2.06(a), the Capser Senior Limited Guaranty shall be released and fully discharged in accordance with its terms.

(b)     Revolving Credit Advances.  The Borrower shall repay to the Administrative Agent for the ratable account of the Lenders on the Termination Date the aggregate principal amount of the Revolving Credit Advances then outstanding.

Section 2.07.     Termination or Reduction of the Revolving Credit Commitments.  The Borrower shall have the right, upon at least ten (10) Business Days' irrevocable prior written notice to the Administrative Agent, to terminate in whole or reduce ratably in part the Unused Commitments, provided that each partial reduction of the Unused Commitment (i) shall be in the aggregate amount of $500,000 or an integral multiple of $10,000 in excess thereof and (ii) shall be made ratably among the Lenders in accordance with their Unused Commitments.  Each such termination or reduction of the Unused Commitments shall be permanent.

Section 2.08.     Optional Prepayments.  Upon at least ninety (90) days' irrevocable prior written notice to the Administrative Agent stating the proposed date and aggregate principal amount of the prepayment and whether such prepayment is of Term Loan Advances or Revolving Credit Advances, the Borrower may prepay the outstanding principal amount of the Advances in whole or in part, together with accrued interest to the date of such prepayment on the principal amount prepaid or Make-Whole Premium, if any, and all other amounts due to the relevant Lenders hereunder (including the reasonable fees, costs and expenses of Administrative Agent and the Lenders).  All prepayments shall be made on the last day of the then existing Interest Period respecting the Advance being prepaid or shall be subject to Break Funding Costs with respect thereto in accordance with the terms of  Section 2.12(f) hereof.  Each prepayment in whole or part of a Revolving Credit Advance shall be in the aggregate amount of $100,000 or an integral multiple of $10,000 in excess thereof and shall be applied ratably among the Lenders.  Each partial prepayment of a Term Loan Advance shall be in the aggregate amount of $1,000,000 or an integral multiple of $100,000 in excess thereof and shall be applied ratably among the Lenders to reduce the outstanding Term Loan Repayment Amounts on a pro rata basis.  In each case of an optional prepayment respecting the Term Loan, the Administrative Agent shall send to each of the parties hereto a revised principal repayment schedule, which revision shall supersede the schedule set forth in Section 2.06.  Following the reduction of the Term Loan Repayment Amount in its entirety, optional prepayment amounts shall be used to prepay Revolving Credit Advances then outstanding.

Section 2.09.     Mandatory Prepayments.

(a)     Upon the occurrence of a sale or other disposition of a Collateral Vessel in accordance with the terms of  Section 5.01(m) hereof or a Total Loss (as defined in the relevant Ship Mortgage) of any Collateral Vessel, the Total Commitment shall be reduced (it being agreed, as per clause (g) hereunder, that all mandatory prepayments made in accordance with this clause (a) will be applied first to reduce future Term Loan Repayment Amounts on a pro rata basis, and thereafter to prepay Revolving Credit Advances then outstanding) in an amount equal to the Total Commitment multiplied by a fraction, the numerator of which is the Fair Market Value (as determined on the basis of the most recently obtained appraisals in accordance with the terms of Section 5.01(l)) of such Collateral Vessel subject to such sale or Total Loss or disposition and the denominator of which is the aggregate Fair Market Value (as determined on the basis of the most recently obtained appraisals in accordance with the terms of Section 5.01(l)) of all Collateral Vessels (including the Collateral Vessel subject to such sale, Total Loss or other disposition).  The Borrower shall prepay any amount equal to the excess of any

TEC000025

principal amount outstanding over such reduced Total Commitment amount together with interest on the amount being prepaid and Break Funding Costs, if any, and any other amounts due in accordance with the terms of Section 8.04(c).

(b)     Upon a breach of any of the terms of Section 5.04(d) hereof, the Borrower shall promptly prepay the Facilities in an amount necessary to cure any such breach.

(c)     Upon a breach of the Borrowing Base Condition, the Borrower shall promptly prepay the Revolving Credit Facility in an amount necessary to cure any such breach.

(d)     If a Change of Control occurs, the Commitments shall terminate and the Borrower shall promptly prepay the Facilities in full, together with interest on the amount prepaid and Break Funding Costs, if any.

(e)     If at any time on or after the first anniversary of the Closing Date the outstanding principal amount of the Term Loan exceeds 70% of the Fair Market Value of the Collateral Vessels, the Borrower shall promptly prepay the outstanding principal amount of the Term Loan exceeding 70% of the Fair Market Value of the Collateral Vessels, together with interest and Break Funding Costs.

(f)     Upon the occurrence of (i) any equity financing, debt financing or similar transaction affecting the Borrower or any member of the Wayfare Group, or (ii) any insurance or casualty event in respect of a Collateral Vessel that is not a Total Loss of such Collateral Vessel, or (iii) any sale, sale and lease-back transaction in respect of a Collateral Vessel (each, a "Mandatory Partial Prepayment Event"), the Borrower shall prepay the outstanding principal of the Term Loan in an amount equal to the amount of the Net Proceeds of such Mandatory Partial Prepayment Event, together with interest thereon to the date of prepayment and Break Funding Costs, if any.  In the event of a Mandatory Partial Prepayment Event under items (i) and (iii) of the preceding sentence, the Term Loan amount shall be prepaid on the date of such event; in the event of a Mandatory Partial Prepayment Event under item (ii) of the preceding sentence, the Term Loan amount shall be prepaid on the date that is the earlier of (x) 180 days after the date on which such casualty event occurred or (y) the date on which proceeds of insurance respecting such casualty event are received by the Administrative Agent.

(g)     All mandatory prepayments made in accordance with the preceding paragraphs will be applied first to reduce future Term Loan Repayment Amounts on a pro rata basis, and thereafter to prepay Revolving Credit Advances then outstanding.

(h)     On or before November 30, 2016 (the "Designated Prepayment Date"), the Borrower shall prepay the outstanding principal of the Term Loan in the amount of $1,600,000, or if greater, the Net Proceeds from any sale of the shares of capital stock of WTC or the assets and properties, tangible or intangible, of WTC (such amount to be prepaid, the "Designated Term Loan Prepayment"), provided that, so long as no Default or Event of Default has occurred and is continuing, in lieu of making the Designated Term Loan Prepayment, the Borrower may, on or before the Designated Prepayment Date, at its cost and expense, provide to the Administrative Agent the WTC Collateral (defined below) on the terms and subject to the conditions herein provided in this Section 2.09 (h), provided further that the Borrower shall have provided not less than twenty (20) days' prior written notice to the Administrative Agent that it shall provide WTC Collateral.

"WTC Collateral" shall mean, in form and substance satisfactory to the Administrative Agent, the following:

TEC000026

(A)   the Guaranty with WTC as "Guarantor", by WTC's accession thereto, as therein provided;

(B)   a first priority pledge and security interest in all shares of capital stock of WTC; and

(C)   a first priority pledge and security interest in all assets and properties, tangible and intangible, of WTC and its Subsidiaries, subject and subordinate only to the Liens of First Interstate Bank ("First Interstate") to secure Indebtedness, existing on the date hereof, of WTC or its Subsidiaries, and further subject to an intercreditor agreement between First Interstate and the Administrative Agent, in form and substance satisfactory to the Administrative Agent.

For the avoidance of doubt, and without limitation of the foregoing, the WTC Collateral shall also include, in form and substance satisfactory to the Administrative Agent, amendments to First Interstate UCC filings, a securities account control agreement pertaining to the Aemetis Stock in a single agreement with First Interstate, Royal Bank of Canada (or such other party that holds the uncertificated securities of Aemetis, Inc.) and the Administrative Agent, and a pledge agreement of the Aemetis Stock.

In relation to the WTC Collateral, the Loan Parties shall execute and deliver such other documents, including amendments to the Loan Documents, provide full and timely disclosure of all assets, properties and liabilities of WTC and its Subsidiaries, and do such other things as the Administrative Agent may reasonably require, and the Administrative Agent shall receive legal opinions, in form and substance, and by such legal counsel, satisfactory to Administrative Agent.

(i)   If the Borrower makes any mandatory prepayment in accordance with the terms of this Section 2.09 on a day other than an Interest Payment Date respecting such amounts being prepaid, together with such payment, the Borrower shall pay Break Funding Costs with respect thereto as provided in Section 2.12(f) and 8.04(c) hereof.

(j)   In each case of a mandatory prepayment respecting the Term Loan, the Administrative Agent shall send to each of the parties hereto a revised principal repayment schedule, which revision shall supersede the schedule set forth in Section 2.06.

Section 2.10.   Increased Costs.  (a)  If, due to either (i) the introduction of or any change in or in the interpretation of any law or regulation or (ii) the compliance with any guideline or request from any central bank or other governmental authority (whether or not having the force of law) which compliance was not required as of August 10, 2016, there shall be any increase in the cost to any Lender of agreeing to make or making, funding or maintaining Advances (excluding for purposes of this Section 2.10 any such increased costs resulting from (i) Taxes or Other Taxes (as to which Section 2.13 shall govern) and (ii) changes in the basis of taxation of overall net income or overall gross income by the jurisdiction or state under the laws of which such Lender is organized or has its Applicable Lending Office or any political subdivision thereof), then the Borrower shall from time to time, within 30 days after demand by such Lender (with a copy of such demand to the Administrative Agent), pay to the Administrative Agent for the account of such Lender additional amounts sufficient to compensate such Lender for such increased cost; provided, however, that before making any such demand, each Lender agrees to use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions) to designate a different Applicable Lending Office if the making of such a designation would avoid the need for, or reduce the amount of, such increased cost and would not, in the reasonable judgment of such Lender, be otherwise disadvantageous to such Lender.  A certificate as to the amount of such increased cost, submitted to the Borrower and the Administrative Agent by such Lender, shall be conclusive and binding for all purposes, absent manifest error.

TEC000027

(b)     If any Lender determines (taking into account such Lender's, or its controlling corporation's, policies with respect to capital adequacy) that compliance, which compliance was not required as of August 10, 2016, with any law or regulation or any guideline or request from any central bank or other Governmental Authority (whether or not having the force of law) affects or would affect the amount of capital required or expected to be maintained by such Lender or any corporation controlling such Lender and that the amount of such capital is increased by or based upon the existence of such Lender's Commitment to lend hereunder and other commitments of such type, then, within 30 days after demand by such Lender (with a copy of such demand to the Administrative Agent), the Borrower shall pay to the Administrative Agent for the account of such Lender, from time to time as specified by such Lender, additional amounts sufficient to compensate such Lender or such corporation in the light of such circumstances, to the extent that such Lender reasonably determines such increase in capital to be allocable to the existence of such Lender's Commitment to lend hereunder.  A certificate as to such amounts submitted to the Borrower and the Administrative Agent by such Lender shall be conclusive and binding for all purposes, absent manifest error.

Section 2.11.   Illegality.   Notwithstanding any other provision of this Agreement, if any Lender shall notify the Administrative Agent that the introduction of or any change in or in the interpretation or application of any law or regulation after August 10, 2016 shall make it unlawful, or any central bank or other Governmental Authority shall assert that it is unlawful, for any Lender or its Applicable Lending Office to perform its obligations hereunder to make or to continue to fund or maintain Advances hereunder, then, on notice thereof and demand therefor by such Lender to the Borrower through the Administrative Agent, (i) any obligations of such Lender to make or to continue to fund or maintain such Advances shall terminate and (ii) the Borrower shall prepay all affected Advances on the last day of the then existing relevant Interest Period (if such Lender may lawfully continue to maintain such Advances to such day) or immediately (if such Lender may not lawfully continue to maintain such Advances to such day).  Upon any such prepayment, the Borrower shall also pay accrued interest on the amount prepaid and Break Funding Costs, if any, and any other amounts due under Section 8.04(c).

Section 2.12.   Payments and Computations.  (a)  The Borrower shall make each payment hereunder and under any other Loan Document not later than 1:00 P.M. (Toronto time) on the day when due in Dollars to the Administrative Agent at the Administrative Agent's Account in same day funds.  The Administrative Agent will promptly thereafter cause to be distributed like funds relating to the payment of principal or interest ratably (other than amounts payable pursuant to Section 2.10, 2.11, 2.13 or 8.04(c)) to the Lenders for the account of their respective Applicable Lending Offices, and like funds relating to the payment of any other amount payable to any Lender to such Lender for the account of its Applicable Lending Office, in each case to be applied in accordance with the terms of this Agreement.  Upon its acceptance of an Assignment and Acceptance and recording of the information contained therein in the Register pursuant to Section 8.07(c), from and after the effective date specified in such Assignment and Acceptance, the Administrative Agent shall make all payments hereunder and under any other Loan Document in respect of the interest assigned thereby to the Lender assignee thereunder, and the parties to such Assignment and Acceptance shall make all appropriate adjustments in such payments for periods prior to such effective date directly between themselves.

(b)     The Borrower hereby authorizes each Lender, if and to the extent payment owed to such Lender is not made when due hereunder or under the Note held by such Lender or any other Collateral Document, to charge from time to time against any or all of the Borrower's accounts with such Lender any amount so due.  Each Lender agrees promptly to notify, or cause the Administrative Agent to notify, the Borrower after any such charge against the Borrower's accounts, provided that the failure to give such notice shall not affect the validity of such charge.

TEC000028

(c)     All computations of interest shall be made by the Payment Agent on the basis of a year of 365 days (or in the case of a leap year, a year of 366 days), in each case for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest is payable.  Each determination by the Payment Agent, or when so provided specifically herein by a Lender, of an interest rate or other amount hereunder shall be conclusive and binding for all purposes, absent manifest error.

(d)     Whenever any payment hereunder or under the Notes shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest or fee, as the case may be; provided, however, that, if such extension would cause payment of interest on or principal of Advances to be made in the next following calendar month, such payment shall be made on the next preceding Business Day.

(e)     Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to any Lender hereunder that the Borrower will not make such payment in full, the Administrative Agent may assume that the Borrower has made such payment in full to the Administrative Agent on such date, and the Administrative Agent may, in reliance upon such assumption, cause to be distributed to each such Lender on such due date an amount equal to the amount then due such Lender.  If and to the extent the Borrower shall not have so made such payment in full to the Administrative Agent, each such Lender shall repay to the Administrative Agent forthwith on demand such amount distributed to such Lender together with interest thereon, for each day from the date such amount is distributed to such Lender until the date such Lender repays such amount to the Administrative Agent, at the Funding Rate.

(f)     Whenever the Borrower makes any payment hereunder or under the Notes on a date that is not an Interest Payment Date, the Borrower shall indemnify the Administrative Agent and the Lenders for any Break Funding Costs by reason thereof as further set forth in Section 8.04(c).

Section 2.13.   Taxes.  (a)  Any and all payments by or on account of any obligation of any Loan Party under this Agreement or any other Loan Document shall be made free and clear of and without deduction or withholding for any Indemnified Taxes or Other Taxes, provided that if any Loan Party or the Administrative Agent shall be required by law to deduct or withhold any Indemnified Taxes or Other Taxes from any such payment, then (i) the sum payable by the relevant Loan Party shall be increased as necessary so that after making all required deductions or withholdings (including deductions or withholdings applicable to additional sums payable under this Section 2.13(a)) the Administrative Agent, each Lender and each other Secured Party receives an amount equal to the sum it would have received had no such deduction or withholding been made, (ii) the relevant Loan Party shall make such deduction or withholding and (iii) the Borrower shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)     The Borrower shall pay any and all Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)     The Borrower shall indemnify the Administrative Agent, each Lender and each other Secured Party for and hold each of them harmless against, within ten (10) days after written demand therefor, the full amount of any Indemnified Taxes or Other Taxes paid or incurred by, or asserted against, the Administrative Agent, such Lender or such other Secured Party (as the case may be) on or with respect to or as a result of any payments or amounts payable by or on account of any obligation of any Loan Party under this Agreement or any other Loan Document or the execution, delivery, filing, registration, recording, performance or enforcement of, or the receipt or perfection of a security interest

TEC000029

under, or otherwise with respect to, this Agreement or any other Loan Document (including Indemnified Taxes or Other Taxes imposed or asserted on or with respect to amounts paid or payable under this Section 2.13(c)) and any liabilities (including penalties, additions to tax, interest and expenses) arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of any such Indemnified Taxes or Other Taxes or liabilities delivered to any Loan Party by a Lender or other Secured Party or by the Administrative Agent (on its own behalf or on behalf of a Lender or other Secured Party) shall be conclusive absent manifest error.

(d)     As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower to a Governmental Authority, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment (if available), a copy of the return reporting such payment, or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)     On or before the Closing Date (and thereafter upon reasonable written request of the Borrower or the Administrative Agent), each Lender will deliver to the Administrative Agent, and the Administrative Agent will deliver to the Borrower a completed, executed and valid United States Internal Revenue Service ("IRS") Form W-8BEN-E, W-8ECI, W-8IMY, W-9 or other appropriate IRS form setting forth its status for U.S. federal Tax withholding purposes.  If any IRS form delivered to the Borrower or the Administrative Agent pursuant to this Section 2.13(e) expires or becomes obsolete or ceases to be valid or accurate, or if any other IRS form becomes required to permit the Borrower or the Administrative Agent to determine its U.S. federal Tax withholding obligations with respect to any payment to be made pursuant to the Loan Documents to or for the benefit of any Lender, the Person to which such IRS form relates (the relevant Lender or the Administrative Agent, as the case may be) shall deliver a replacement IRS form (or applicable successor form) and any such additional IRS form setting forth its status for U.S. federal Tax withholding purposes.

(f)     If the Administrative Agent, a Lender or other Secured Party determines, in its sole discretion (acting in good faith), that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to Section 2.13(a), it shall pay over such refund to the Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 2.13 with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent, such Lender or other Secured Party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided, that the Borrower, upon the request of the Administrative Agent or such Lender or other Secured Party, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent, such Lender or other Secured Party is required to repay such refund to such Governmental Authority.  This Section shall not be construed to require the Administrative Agent, any Lender or other Secured Party to make available its Tax returns (or any other information relating to its Taxes which it deems confidential) to the Borrower or any other Person.

Section 2.14.   Sharing of Payments, Etc.  If any Lender shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) on account of the Advances owing to it (other than pursuant to Section 2.10, 2.11, 2.13 or 8.04(c)) in excess of its ratable share of payments on account of the Advances obtained by all the Lenders, such Lender shall forthwith purchase from the other Lenders such participations in the Advances owing to them as shall be necessary to cause such purchasing Lender to share the excess payment ratably with each of them; provided, however, that (x) if all or any portion of such excess payment is thereafter recovered from such purchasing Lender, such

TEC000030

purchase from each Lender shall be rescinded and such Lender shall repay to the purchasing Lender the purchase price to the extent of such recovery together with an amount equal to such Lender's ratable share (according to the proportion of (i) the amount of such Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered and (y) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any amount received by a Lender as consideration for the assignment of or sale of a participation in any of its Advances or Commitments to any assignee or participant.  The Borrower agrees that any Lender so purchasing a participation from another Lender pursuant to this Section 2.14 may, to the fullest extent permitted by law, exercise all its rights of payment (including the right of set-off) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation.

Section 2.15.    Use of Proceeds.

(a)    The Term Loan Advance proceeds shall be used to consummate the Bridge Notes Refinancing and to complete the Acquisition.

(b)    The Revolving Credit Advance proceeds shall be used for ongoing working capital expenses and other general corporate purposes of PTI One and PTI Two.

(c)    No proceeds of the Facility will be used to fund any operations in, finance any investments or activities in or make any payment to, a Sanctions Target in violation of applicable Sanctions or in any manner that would cause any Secured Party to be in breach of Sanctions.

Section 2.16.    Mitigation.

(a)    If, after the date hereof, the Borrower is required to pay any material additional amount to any Lender under Section 2.10 or 2.13 (or to any Governmental Authority for the account of any Lender pursuant to Section 2.13), then, if reasonably requested by the Borrower in writing, such Lender shall use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions) to designate a different Applicable Lending Office if, in the opinion of such Lender, such designation (i) would avoid the need for, or reduce the amount of, any such additional amounts that may thereafter accrue and (ii) would not subject such Lender to any unindemnified liability, loss, cost or expense and (iii) would not otherwise be disadvantageous to such Lender. The Borrower shall pay all reasonable costs and expenses incurred by the Administrative Agent or any Lender in connection with any such designation.

(b)    If, after the date hereof, the Borrower is required to pay any material additional amount to any Lender under Section 2.10 or 2.13 (or to any Governmental Authority for the account of any Lender pursuant to Section 2.13), or if any Lender defaults in its obligation to fund Advances hereunder, then the Borrower may, at its sole expense and effort, upon written notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 8.07), all its interests, rights and obligations under this Agreement and the other Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment),  provided that (i) such Lender shall have received payment of an amount equal to the outstanding principal of its Advances, accrued interest thereon, accrued fees, Break Funding Costs, if any, and all other amounts due, owing and payable to it under this Agreement or any other Loan Document at such time, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) and (ii) such assignment would avoid the need for, or reduce the amount of, any such additional

TEC000031

amounts that may thereafter accrue. A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

## ARTICLE III

## CONDITIONS PRECEDENT TO LENDING

Section 3.01.   <u>Conditions Precedent on the Closing Date</u>.  The obligation of each Lender to make its Term Loan Advance on the Closing Date and any requested Revolving Credit Advance on the Closing Date, in each case up to the amount of its Commitment relating thereto, and in the aggregate for all Lenders not in excess of the Total Commitment, is subject to, in the reasonable opinion of the Majority Lenders, the satisfaction of the following conditions precedent before or on the Closing Date, provided however that, notwithstanding any other term of this Agreement, proceeds of the Term Loan Advance in an amount equal to the balance of the sale price (the "Sale Price") due and payable to the Seller of each Collateral Vessel by the relevant Vessel Owning Subsidiary shall be held in a suspense or escrow account controlled by the Administrative Agent pending satisfaction, in the Administrative Agent's sole discretion, of the conditions precedent on the Delivery Date of a Collateral Vessel, as set forth in Section 3.03, whereupon such proceeds in an amount equal to the  due and payable Sale Price of such Collateral Vessel shall be released to the order of the Borrower for satisfaction of such Vessel Owning Subsidiary's obligation to the Seller :

(a)      The Administrative Agent shall have received on or before the Closing Date the following, each dated the Closing Date (unless otherwise specified), in form and substance reasonably satisfactory to the Administrative Agent (unless otherwise specified) and (except for the Notes) in sufficient counterparts for each Lender:

(i)      This Agreement and the Notes payable to each respective Lender.

(ii)      (A)  The Guaranty.

(B)  The Key Man Guaranty.

(C)  The Capser Senior Limited Guaranty and related Pledge of Securities Portfolio.

(iii)      (A)  The Security Trust Agreement.

(B)  A Deposit Account Control Agreement for each of the Borrower, PTI One, PTI Two and Capser Senior.

(C)  An Account Pledge Agreement for each of the Borrower, PTI One, PTI Two and Capser Senior.

(D) POU Agreement.

(iv)      A General Security Assignment for each of the Borrower, PTI One, PTI Two and WSO.

(v)      A Stock Pledge by each of the Key Man, the Borrower and WSO.

TEC000032

(vi)     An Officer's Certificate of each Loan Party (other than the Parent Guarantors) certifying as to and attaching copies of the resolutions of the Board of Directors (or similar body) of such Loan Party approving this Agreement and each other Loan Document to which it is or is intended to be a party and the Transaction, and of all documents evidencing other necessary corporate, or limited liability company, action and governmental and other third party approvals and consents, if any, with respect to the Transaction, this Agreement and each Loan Document to which it is or is to be a party.

(vii)     An Officer's Certificate of each Loan Party (other than the Parent Guarantors) certifying as to and attaching copies of the articles of incorporation (or similar formation document) and by-laws or operating agreement of such Loan Party certifying the names and true signatures of the officers or directors of such Loan Party authorized to sign each Loan Document to which it is or is to be a party and the other documents to be delivered hereunder and thereunder.

(viii)     A certificate of good standing, or equivalent, as to each Loan Party (other than the Parent Guarantors) issued by (A) the relevant jurisdiction of formation of such Loan Party and (B) each jurisdiction in which it carries on business or where registration or filings in relation to the Collateral have been effected, in each case, dated not more than five (5) Business Days or such longer time as the Administrative Agent may agree prior to the Closing Date.

(ix)     A certificate of a Responsible Officer of the Borrower, dated the Closing Date, in form and substance satisfactory to the Administrative Agent, certifying that (A) the representations and warranties of each Loan Party contained in each Loan Document in effect or intended to be in effect immediately following the Advances are correct in all material respects on and as of the date of such Advance, before and after giving effect to such Advance and to the application of the proceeds therefrom, as though made on and as of the such Date (other than any such representations or warranties that, by their terms, refer specifically to a date other than the date of such Advance), (B) each Loan Party is Solvent, (C) no event has occurred and is continuing, or would result from the making of such Advance or from the application of the proceeds therefrom, that constitutes a Default or an Event of Default, (D) certifying as to the absence of any pending proceeding for the dissolution or liquidation of such Loan Party, or to the knowledge of such Loan Party threatening its existence and (E) the Revolving Credit Commitment is not less than zero after giving effect to such Revolving Credit Advance.

(x)     each of the statements set forth in or by reference in the certificate described in the preceding sub-clause (ix) shall be true and correct in all material respects.

(xi)     A Notice of Borrowing relating to the Term Loan Advance and any Revolving Loan Advance to be made on the Closing Date.

(xii)     In each case, addressed to the Administrative Agent and the Lenders:

(A) a favorable opinion of Gilmartin, Poster & Shafto LLP, special New York, Delaware and Marshall Islands counsel for the Loan Parties;

TEC000033

(B) a favorable opinion of Holland & Hart, LLP, special Montana counsel for the Loan Parties, and any relevant local counsel in other states where Collateral is registered;  and

(C) a favorable opinion of Holland & Knight LLP, special counsel for the Administrative Agent.

(xiii)   Copies certified by a Responsible Officer of the Borrower of (A) the PTI One Charter, the PTI Two Charter and all time charters, bareboat charters or other Collateral Vessel-related contracts required to be assigned to the Administrative Agent on the Closing Date and all Inter-Company Charters and (B) each Charter Parent Guarantee and Indemnity.

(xiv)   All documents, instruments (including Uniform Commercial Code financing statements), notices, acknowledgments, registrations or similar instruments filed or for filing, in appropriate jurisdictions or to be given or made under any applicable law shall have been completed as reasonably requested by the Lenders so that there shall have been created a valid and perfected assignment or charge in or over the Collateral in favor of the Administrative Agent (in its capacity as Administrative Agent or Security Trustee).

(xv)   In respect of the Parent Guarantors, as applicable:

(A) certified copies of personal statements of the net worth of each of the Key Man and Capser Senior; and

(B) certified copies of background and credit report, civil litigation and criminal offense checks of the Key Man.

(xvi)   Copies of releases and discharges evidencing that all loan obligations, security interests, pledges and charges granted by the Borrower or any other member of the Wayfare Group or in respect of the Collateral, in each case in favor of any Person other than the Administrative Agent, have been terminated and released, or provision made therefor, all to the reasonable satisfaction of the Administrative Agent.

(xvii)   A schedule of the final use of the proceeds of the Advances satisfactory to the Administrative Agent and a pro forma Consolidated balance sheet of the Borrower after giving effect to the Acquisition and the financing incurred in connection herewith, in each case, certified by a Responsible Officer of the Borrower.

(xviii)   A certified copy of a valuation certificate from the Approved Broker confirming (A) compliance with the Fair Market Value Coverage Ratio, together with a copy of the appraisal and (B) the Collateral Vessels have a Fair Market Value acceptable to the Administrative Agent.

(xix)   (A) Since August 10, 2016, there shall not have occurred any Material Adverse Effect in the operation, financial condition or business prospects of the Wayfare Group, (B) no litigation by any entity (governmental or private) shall be pending or threatened with respects to this Agreement or the Loan Documents or the

TEC000034

Transaction which has had or could reasonably be expected to have, a Material Adverse Effect, (C) no material deviation from the forecasts and projections which have heretofore been furnished by the Borrower to the Administrative Agent shall have occurred, and (D) no material damage or destruction shall have occurred to any of the Collateral, nor any depreciation in value thereof and all dry dock expenditures of the Collateral Vessels shall have been completed, and a Responsible Officer of the Borrower shall have certified to each of the same.

(xx)     Evidence satisfactory to the Administrative Agent that, in the aggregate, the Borrower shall have, after purchase of the Collateral Vessels and payment of all financing fees and expenses, a minimum in cash and Cash Equivalents (including availability under the Revolving Credit Facility) of US$1,000,000.

(xxi)     A list of all existing charters respecting the Collateral Vessels and all related party creditors.

(xxii)     All governmental approvals, material third party approvals and/or consents and/or waivers as the Administration Agent or its counsel shall deem necessary or desirable in connection with the Transaction (including, but not limited to approvals, consents and/or waivers from any landlords, warehousemen, mortgagees, licensors and others that might assert claims against the Collateral) shall have been obtained and remain in effect, and there shall not exist any judgment, order, injunction or other restraint prohibiting or imposing material adverse conditions on the Transaction.

(xxiii)     All Indebtedness of the Borrower (and all guaranties thereof and security therefor), as well as the Transaction and the consummation thereof, shall be in compliance with all applicable requirements of law, including Regulations T, U, and X of the United States Federal Reserve Board.

(xxiv)     A letter from the process agent named in Section 8.15 and in the other Loan Documents, as applicable, in form and substance satisfactory to the Administrative Agent confirming such process agent's acceptance of its appointment for service of process on all Loan Parties in connection with the Loan Documents.

(xxv)     All "Know Your Customer" information and information under applicable Canadian federal and provincial, United States, and European Union anti-money laundering rules and regulations or the Patriot Act or otherwise, in each case as requested by any Lender in connection with its internal compliance regulations thereunder.

(xxvi)     All fees, costs and expenses then due hereunder and all other fees, costs and expenses (including without limitation legal fees and expenses of the Administrative Agent and the fees and expenses of the appraisers, consultants and other advisors) and other compensation due and payable hereunder to the Administrative Agent and Lenders shall have been paid in full by the Borrower.

(xxvii)     The Closing Date shall have occurred not later than October 21, 2016.

TEC000035

(xxviii) Schedules V, VI and VII shall have been updated to be true and correct as of immediately following the consummation of the Transaction.

(xxix)   Evidence satisfactory to the Administrative Agent that, the cash management and financial control systems, hedging policies and reporting capabilities in place for the Wayfare Group are sufficient and of a standard consistent with similarly positioned businesses.

(xxx)   Each of the PTI One Charter and PTI Two Charter shall (A) have a minimum day rate of $8,500 per Collateral Vessel on a bareboat basis, (B) have a minimum term of five (5) years, (C) be secured with a guarantee in favor of the Borrower assigned to the Administrative Agent and (D) be otherwise acceptable to the Administrative Agent.

(xxxi)   Unaudited Consolidated balance sheets of the Borrower and its Subsidiaries as at the Closing Date, certified by a Responsible Officer, presenting fairly the Consolidated financial condition of the Borrower and its Subsidiaries as at such date.  All such financial statements, including the related schedules and notes thereto, shall have been prepared in accordance with US GAAP applied consistently.

(xxxii)  Such other items as the Administrative Agent (or any Lender through the Administrative Agent) may reasonably require.

(b)   The Borrower shall have paid all accrued and unpaid costs, fees and expenses of the Administrative Agent and the Lenders (including, without limitation, legal fees and expenses) in connection herewith which are due and payable on or prior to the Closing Date and where appropriate, timely invoiced.

Section 3.02.   Conditions Precedent to Each Revolving Credit Advance Subsequent to the Closing Date. The obligation of each Lender to make a Revolving Credit Advance subsequent to the Closing Date, shall be subject to the conditions precedent that the Closing Date shall have occurred (and the conditions precedent described in Section 3.01 shall have been met) and:

(a)   on the date of such subsequent Revolving Credit Advance the following statements shall be true (and each of the giving of the applicable Notice of Borrowing satisfying the requirements of Section 2.02(a) and the acceptance by the Borrower of the proceeds of such Advance shall constitute a representation and warranty by the Borrower that on the date of such Advance such statements are true):

(i)   the representations and warranties of any Loan Party contained in each Loan Document are correct in all material respects on and as of the date of such Advance, before and after giving effect to such Advance and to the application of the proceeds therefrom, as though made on and as of such date other than any such representations or warranties that, by their terms, refer to a date other than the date of such Advance;

(ii)   no event has occurred and is continuing, or would result from such Advance or from the application of the proceeds therefrom, that constitutes a Default;

(iii)   the Revolving Credit Commitment is not less than zero after giving effect to such Revolving Credit Advance; and

TEC000036

(iv)    there is no breach of the Borrowing Base Condition and no such breach will result upon giving effect to such Revolving Credit Advance.

(b)    the Administrative Agent shall have received a current Borrowing Base Certificate evidencing satisfaction of the Borrowing Base Condition both before and after giving effect to the requested borrowing.

Section 3.03.   <u>Delivery Date Conditions Precedent</u>. On or before the Delivery Date of each Collateral Vessel, the following conditions precedent shall have been satisfied, in the Administrative Agent's sole discretion, in order for the Administrative Agent to release to the order of the Borrower from the suspense account controlled by the Administrative Agent, proceeds of the Term Loan Advance in an amount equal to the Sale Price (defined above) due and payable to the Seller of a Collateral Vessel by the relevant Vessel Owning Subsidiary on the Delivery Date of such Collateral Vessel:

(a)    The preconditions set forth in Section 3.01 shall have been met.

(b)    The Administrative Agent shall have received on or before the applicable Delivery Date the following:

(i)    (A) A Ship Mortgage for such Collateral Vessel in favor of the Security Trustee, the Administrative Agent, or TEC, as the case may be, together with evidence that such Ship Mortgage has been duly recorded and is in full force and effect.

(B) An Assignment of Insurances covering such Collateral Vessel.

(C) An Assignment of Earnings covering such Collateral Vessel.

(D) An Assignment of Charter for such Collateral Vessel together with the Notice of Assignment and the Agreement and Consent to Assignment relating to the PTI One Charter and the PTI Two Charter, respectively.

(ii)    (A) Evidence of insurance in respect of all Collateral naming the Administrative Agent as sole loss payee (and/or additional assured with waiver of premium if so requested) with such responsible and reputable insurance companies or associations, and in such amounts and covering such risks and containing such terms as is required by the Ship Mortgage relating to such Collateral Vessel and as is satisfactory to the Administrative Agent in its reasonable discretion.

(B) Letters of undertaking, copies of cover notes and loss payable clauses and a favorable opinion from the Borrower's insurance brokers as to insurances covering the relevant Collateral Vessel, in form reasonably acceptable to the Administrative Agent.

(C) A report addressed to the Lenders by independent insurance advisors to and appointed by the Administrative Agent describing all marine insurances in detail, and confirming that such insurances conform to the requirements of the Loan Documents and are reasonable and adequate for the protection of the Lenders.

(D) A certificate of mortgagee's interest insurance from an insurer acceptable to the Administrative Agent in favor of the Administrative Agent and

TEC000037

reflecting coverage in an amount not less than one hundred and ten percent (110%) of the Term Loan Advance and Revolving Credit Notes Limit.

(E)  Subordination letters of undertaking executed by, inter alia, the relevant Charterer and the Manager covering the relevant Collateral Vessel, in form and substance acceptable to the Administrative Agent.

(iii)      (A) Interim Class Certificates evidencing that such Collateral Vessel is in class without overdue recommendations affecting class.

(B) Evidence that the applicable Vessel Owning Subsidiary is in compliance with the Hong Kong law and with ISM and also with the International Ship and Port Facility Security Code as adopted by the IMO, such evidence being a valid Document of Compliance  (being a Document issued to a vessel operator as evidence of its compliance with the requirements of the ISM Code) duly issued to such Vessel Owning Subsidiary and a valid Safety Management Certificate (being a Document issued to a vessel as evidence that the vessel operator and its shipboard management operate in accordance with an approved and structured and documented system enabling the personnel of that vessel operator to implement effectively the safety and environmental protection policy of that vessel operator) duly issued to the respective Collateral Vessel pursuant to the ISM Code.

(C) A copy of a transcript of registry satisfactory to the Administrative Agent showing that the applicable Vessel Owning Subsidiary is the registered owner of the relevant Collateral Vessel in the Hong Kong ship registry, free and clear of all recorded liens except the Ship Mortgages.

(D) Copies of the bill of sale and protocol of delivery and acceptance respecting the Collateral Vessel delivered on such date and evidence satisfactory to the Administrative Agent that the applicable Vessel Owning Subsidiary holds title free and clear of all liens except Permitted Liens.

(iv)      In each case, addressed to the Administrative Agent and the Lenders:

(A) a favorable opinion of Gilmartin, Poster & Shafto LLP, special New York, Delaware and Marshall Islands counsel for the Loan Parties, and any relevant local counsel in Montana and other states where Collateral is registered;

(B) a favorable opinion of Holland & Knight LLP, special counsel for the Administrative Agent; and

(C) a favorable opinion of Clifford Chance LLP, Hong Kong office, special counsel for the Administrative Agent.

(v)      A list of all existing charters respecting the Collateral Vessels and all related party creditors.

(vi)      On the date of such release to the Borrower of the proceeds of the Term Loan Advance the following statements shall be true, and a Responsible Officer of the Borrower shall certify as to the satisfaction of the requirements of this Section 3.03, and the acceptance by the Borrower of the proceeds of such Advance

34
Senior Secured Credit Facility

shall constitute a representation and warranty by the Borrower that on the date of the release to it of the proceeds of such Advance such statements are true):

(A)     the representations and warranties of any Loan Party contained in each Loan Document are correct in all material respects on and as of the date of such release of Advance proceeds, before and after giving effect to such release Advance proceeds and to the application of such proceeds, as though made on and as of such date other than any such representations or warranties that, by their terms, refer to a date other than the date of such Advance;

(B)     no event has occurred and is continuing, or would result from such release of Advance proceeds or from the application of such proceeds, that constitutes a Default;  and

(C)     the amount of such Advance proceeds being released to the order of the Borrower for the benefit of the Seller do not exceed the amount of the Sale Price then due and payable  to the Seller by the relevant Vessel Owning Subsidiary.

Section 3.04.    <u>Conditions Subsequent to Closing Date</u>. As soon as reasonably practicable following the Closing Date but in any event no later than 5 Business Days following the Closing Date, the Administrative Agent shall have received the Key Man Life Insurance, in form and substance reasonably satisfactory to the Administrative Agent.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES

Section 4.01.    <u>Representations and Warranties of the Borrower</u>.  Except as otherwise explicitly set forth below, on each of the Execution Date, the Closing Date and on each date an Advance is requested under Section 3.02 or Section 3.03, the Borrower represents and warrants as follows:

(a)     <u>Organization; Qualifications</u>.  Each Loan Party, as applicable, and each of its Subsidiaries (i) is a corporation or limited liability company duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (ii) is duly qualified and in good standing as a foreign corporation or limited liability company in each jurisdiction other than its jurisdiction of formation in which it owns or leases property or in which the conduct of its business requires it to so qualify or be licensed except where the failure to so qualify or be licensed could not be reasonably likely to have a Material Adverse Effect and (iii) has all requisite corporate (or limited liability company) power and authority (including, without limitation, all Governmental Authorizations) to own or lease and operate its properties and to carry on its business as now conducted and as proposed to be conducted.

(b)     <u>Loan Parties; Ownership.</u>  (i) Set forth on Schedule IV hereto is a complete and accurate list of all Loan Parties and Subsidiaries of each Loan Party on the Execution Date, showing (as to each such Subsidiary) the jurisdiction of its incorporation or organization and the percentage ownership interests of each applicable Loan Party in such Subsidiary.  On each date set forth above other than the Execution Date, Schedule IV contains a complete and accurate list of all Loan Parties, the jurisdiction of incorporation or organization, as applicable, and the percentage ownership interests of each Loan Party in such other Loan Party.  All of the outstanding Equity Interests in each Loan Party have been validly issued, are fully paid and non-assessable and are owned by a Loan Party free and clear of all Liens, except those created under the Collateral Documents, and Permitted Liens.

TEC000039

(ii) Immediately following the Acquisition, Permitted Holders will hold not less than 100% of the voting power in the Borrower's equity interest .

(c) <u>Due Authorization, Etc.</u> The execution, delivery and performance by each Loan Party of each Loan Document to which it is or is to be a party, the making of the Advances, the application of proceeds and repayment thereof by the Borrower, and the consummation of the Transaction are within such Loan Party's corporate (or limited liability company) powers, have been duly authorized by all necessary corporate (or limited liability company) action, , as applicable, and do not (i) contravene such Loan Party's charter or bylaws or limited liability company agreement, as the case may be; (ii) violate any law, rule, regulation (including, without limitation, Regulations T, U and X of the Board of Governors of the United States Federal Reserve System), order, writ, judgment, injunction, decree, determination or award, (iii) conflict with or result in the breach of, or constitute a default or require any payment to be made under, any agreement respecting Indebtedness or any other material contract, loan agreement, indenture, mortgage, deed of trust, lease or other instrument binding on or affecting any Loan Party, any of its Subsidiaries or any of their properties or (iv) except for the Liens created under the Loan Documents, result in or require the creation or imposition of any Lien upon or with respect to any Collateral. No Loan Party or any of its Subsidiaries is in material violation of any such law, rule, regulation, order, writ, judgment, injunction, decree, determination or award except to the extent that any such violation, individually or in the aggregate, could not be reasonably expected to have a Material Adverse Effect.

(d) <u>Governmental Notices.</u> Except for (x) any Ship Mortgage recording requirements under the relevant jurisdiction of Collateral Vessel registration, (y) any court filings in connection with the enforcement of any ship mortgages generally in any court located in a jurisdiction of enforcement, or (z) any consent of the jurisdiction where a Collateral Vessel is flagged that is required for the transfer of a Collateral Vessel in connection with the exercise of private remedies after an Event of Default shall have occurred and be continuing, no Governmental Authorization, and no notice to or filing with, any Governmental Authority or any other third party is required for (i) the due execution, delivery, recordation, filing or performance by any Loan Party of any Loan Document to which it is or is to be a party, (ii) the grant by any Loan Party of the Liens intended to be granted by it pursuant to the Collateral Documents or the validity of such Liens, (iii) the perfection or maintenance of the Liens created under the Collateral Documents (including the first priority nature thereof) or (iv) the exercise by the Administrative Agent or the Security Trustee or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents.

(e) <u>Enforceability.</u> This Agreement has been, and each other Loan Document when delivered hereunder will have been, duly authorized, executed and delivered by each Loan Party (or Manager with respect to a Manager's Undertakings) party thereto. This Agreement is, and each other Loan Document when delivered hereunder will be, the legal, valid and binding obligation of each Loan Party (or Manager with respect to a Manager's Undertakings) party thereto, enforceable against such Loan Party (or Manager with respect to a Manager's Undertakings) in accordance with its terms except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law) but not excepting fraudulent conveyance laws.

(f) <u>Litigation.</u> Except as set forth on Schedule VII, there is no action, suit, investigation, litigation or proceeding affecting any Loan Party or any of its Subsidiaries, including any Environmental Action, pending or threatened before any Governmental Authority or arbitrator that (i) could be reasonably likely to have a Material Adverse Effect (other than the Disclosed Litigation) or (ii) purports to affect the legality, validity or enforceability of any Loan Document or the consummation

TEC000040

of the Transaction contemplated by any Loan Document, and there has been no adverse change in the status, or financial effect on any Loan Party or any of its Subsidiaries, of the Disclosed Litigation from that described on Schedule VI hereto.

    (g)    <u>Financial Statements; Material Adverse Effect</u>.

    (i)    The <u>pro forma</u> unaudited Consolidated balance sheets of the Borrower and its Subsidiaries as at the Closing Date, certified by a Responsible Officer, copies of which have heretofore been furnished to each Lender, present fairly the Consolidated financial condition of the Borrower and its Subsidiaries, as at such date. All such financial statements, including the related schedules and notes thereto, have been prepared in accordance with US GAAP applied consistently.

    (ii)    Since August 10, 2016, there has been no event or circumstance that, individually or in the aggregate with other events or circumstances, has or would reasonably be expected to have a Material Adverse Effect on the Borrower and its Subsidiaries taken as a whole.

    (h)    <u>No Untrue Statements</u>. No written information, other than information related to general economic and industry conditions and other than projections, exhibits or reports furnished by or on behalf of any Loan Party to the Administrative Agent or any Lender in connection with the negotiation and syndication of the Loan Documents or pursuant to the terms of the Loan Documents contained as of the date made any untrue statement of a material fact or omitted to state a material fact, when taken as a whole, necessary to make the statements made therein not misleading.

    (i)    <u>No Margin Stock</u>. No Loan Party is engaged in the business of extending credit for the purpose of purchasing or carrying margin stock, and no proceeds of any Advance will be used to purchase or carry any margin stock, or to refund Indebtedness originally incurred to purchase or carry, or to extend credit to others for the purpose of purchasing or carrying, any margin stock.

    (j)    <u>No "Investment Company"</u>. No Loan Party is an "investment company" as such terms is defined in the United States Investment Company Act of 1940, as amended.

    (k)    <u>No Restriction</u>. On the Closing Date, no Loan Party is a party to any indenture, loan, secured or unsecured credit facility or any lease or other agreement or instrument or subject to any charter or corporate restriction that could be reasonably likely to have a Material Adverse Effect. On the Closing Date, no Loan Party has entered into any agreement under which it has incurred or would incur Indebtedness in order to complete the Transaction, other than the Loan Documents and documents respecting the Bridge Notes Refinancing.

    (l)    <u>Security Perfection</u>. (i) All filings, registrations, notices, acknowledgements, consents and other actions necessary or as reasonably requested by the Administrative Agent to perfect and protect the security interest in the Collateral created under the Collateral Documents have been duly made or taken and are in full force and effect, and the Collateral Documents create in favor of the Administrative Agent or Security Trustee, as the case may be, for the benefit of the Secured Parties a valid and, together with such filings, registrations, notices, acknowledgements, consents and other actions, perfected first priority security interest in the Collateral, securing the payment of the Obligations under the Loan Documents. The respective Loan Party is the legal and beneficial owner of the Collateral free and clear of any Lien, except for Permitted Liens. Each Ship Mortgage has been duly executed and delivered, creates in favor of the Security Trustee, the Administrative Agent or TEC, as the case may be, for the benefit of the Secured Parties a legal, valid, and enforceable first preferred mortgage Lien over the

TEC000041

whole of the Collateral Vessel therein named and when duly recorded in the appropriate ship registry office shall establish a first preferred mortgage thereunder upon the such Collateral Vessel, (ii) none of the Loan Parties or any Affiliate has any place of business located in  England and Wales on the Execution Date and the Closing Date, and (iii) none of the Loan Parties or any Affiliate has any place of business located in the United States on the Execution Date and the Closing Date other than the office of the Key Man located in Billings, Montana.

(m)     Solvent.  Each Loan Party is, individually and together with its Subsidiaries, Solvent.

(n)     Environmental Laws.  Except as set forth in Schedule VII, hereto, the operations and properties of each Loan Party and each of its Subsidiaries (including, but not limited to, each Collateral Vessel) comply in all material respects with all applicable Environmental Laws and Environmental Permits, all past non-compliance with such Environmental Laws and Environmental Permits has been resolved without ongoing obligations or costs, and no circumstances exist that could be reasonably likely to (A) form the basis of an Environmental Action against any Loan Party or any of its Subsidiaries or any of their properties or (B) cause any such property to be subject to any Lien or any restrictions on ownership, occupancy, use or transferability under any Environmental Law), except to the extent that the failure to do so would not reasonably be expected to result in a Material Adverse Effect.

(o)     Tax Returns.  Each Loan Party and each of its Subsidiaries has duly filed all Tax returns and reports required by applicable law to be filed by or with respect to it and has duly paid all Taxes due and payable by or with respect to it (including applicable interest and penalties), except to the extent that the failure to do so would not reasonably be expected to result in a Material Adverse Effect.

(p)     Good Title.  Each Loan Party has good and marketable title to its personal property and assets (including any Collateral Vessel owned by such Loan Party) free and clear of all liens and encumbrances, in each case, other than Permitted Liens.

(q)     Indebtedness and Guaranty Obligations.  Set forth on Schedule V hereto is a complete and accurate list of all existing Indebtedness and Guaranty Obligations showing as of the Execution Date and the Closing Date the obligor and the principal amount outstanding thereunder.

(r)     ERISA.  No Loan Party or any of its ERISA Affiliates sponsors, maintains or contributes to (or is required to contribute to) a Plan as of the Execution Date and the Closing Date.

(s)     Collateral Vessels.

(i)     The Collateral Vessels known as M.T. CYGNUS and M.T. SEXTANS are or, on the Closing Date and completion of the Acquisition, will be, duly registered in the names of PTI One and PTI Two, respectively, as shipowner under the laws and flag of Hong Kong.

(ii)     Each Loan Party that owns or will own a Collateral Vessel is qualified to own such Collateral Vessel under the laws of its jurisdiction of registry, as may be applicable, or such other jurisdiction in which any such Collateral Vessel is permitted, or will be permitted, to be registered or operated in accordance with the terms of the respective Ship Mortgage.

(iii)     Each Collateral Vessel complies with the provisions of the applicable Ship Mortgage regarding classification.

TEC000042

        (iv)     On the Closing Date and thereafter, each Collateral Vessel will be chartered to the relevant Charterer under the applicable Charter.

        (t)     <u>Charters</u>. (i) There are no Inter Company Charters as of the Closing Date. All Inter Company Charters, if any, will be subject and subordinate in all respects to (A) the lien of the relevant Ship Mortgage in respect of the Collateral Vessel that is the subject of an Inter Company Charter and (B) the rights of the Administrative Agent, the Security Trustee or TEC, respectively, under such Ship Mortgage or otherwise.

        (ii)     A true, correct and complete list of charters having a remaining term after the Execution Date of four (4) months or greater, including any extension option, and copies of such charters, have been delivered the Administrative Agent. All such charters, other than the PTI One Charter and the PTI Two Charter, covering a Collateral Vessel will be as of the Closing Date and thereafter subject and subordinate in all respects to (A) the lien of the Ship Mortgage in respect of the Collateral Vessel that is the subject of such charter and (B) the rights of the Administrative Agent, the Security Trustee or TEC respectively, under such Ship Mortgage or otherwise.

        (u)     <u>Loan Parties' Representations</u>.  The representations and warranties given by any Loan Party contained in any Loan Document are true, correct and complete when made.

        (v)     <u>Proceeds</u>.  The proceeds of the Advances will be used only as set forth in Section 2.15 hereof.

        (w)     <u>Anti- Money Laundering Compliance</u>.  In relation to the terms of this Agreement and the other Loan Documents and the performance and discharge of its Obligations and liabilities under this Agreement or any other Loan Document and the Transaction and other arrangements effected or contemplated by this Agreement or any other Loan Documents, each of the Borrower and the other Loan Parties is acting for its own account, and the foregoing will not involve or lead to a contravention of any law, official requirement or other regulatory measure or procedure which has been implemented to combat "money laundering" (as defined in Article 1 of the Directive (91/308/EEC) of the Council of the European Community).

        (x)     <u>Fiscal Year</u>.  The fiscal year of the Borrower and its Consolidated Subsidiaries ends on December 31.

ARTICLE V

COVENANTS OF THE BORROWER

Section 5.01.    <u>Affirmative Covenants</u>.  So long as any Advance or any other Obligation of any Loan Party under any Loan Document shall remain unpaid or unperformed or any Lender shall have any Commitment hereunder, the Borrower covenants and agrees that it and each other Loan Party will:

        (a)     <u>Preservation of Existence, Etc</u>.  Preserve and maintain, and cause each of its Subsidiaries to preserve and maintain, its respective existence, legal structure, legal name, rights (charter and statutory), permits, licenses, trading certificates, approvals, privileges and franchises, management, business, capital structure, accounting treatment and reporting practices; except where the failure to do so could not reasonably be expected to adversely affect the rights and remedies of the Administrative Agent,

TEC000043

the Security Trustee, the Collateral Agent or the Lenders under the Loan Documents or to have a Material Adverse Effect.

(b)      Office, Etc.  Maintain its principal place of business at 2505 46th Street West, Billings, MT 59106, retain all books and records at such location, and not change its principal place of business unless not less than thirty (30) days prior written notice of such change has been given to the Administrative Agent.

(c)      Payment of Taxes and Obligations, Etc.  Pay and discharge, and cause each of its Subsidiaries to pay and discharge, before the same shall become delinquent, (i) all lawful claims that, if unpaid, might by law become a Lien upon its property, (ii) all Taxes required by applicable law to be paid by it or by any of its Subsidiaries or Affiliates (whether such Taxes are imposed upon it or any of its Subsidiaries or Affiliates or upon its or their income or profits or upon any property belonging to it or any of them, or otherwise), except (i) Taxes which it (or any of its Subsidiaries or Affiliates) is contesting in good faith by appropriate proceedings and as to which appropriate reserves are being maintained in accordance with US GAAP (provided that such contest does not involve any risk of criminal penalty or seizure of any Collateral) or (ii) Taxes the nonpayment of which could not reasonably be expected to result in a Material Adverse Effect.

(d)      Compliance with Laws, Etc.  Comply, and cause each of its Subsidiaries and the Manager to comply, with all applicable laws, rules, regulations and orders, except to the extent such failure to comply would not reasonably be expected to result in a Material Adverse Effect.

(e)      Compliance with Environmental Laws.  Comply, and cause each of its Subsidiaries and all lessees and other Persons operating or occupying its properties to comply, in all material respects, with all applicable Environmental Laws and Environmental Permits; obtain and renew, and cause each of its Subsidiaries to obtain and renew, all Environmental Permits necessary for its operations and properties; and conduct, and cause each of its Subsidiaries to conduct, any investigation, study, sampling and testing, and undertake any cleanup, removal, remedial or other action necessary to remove and clean up all Hazardous Materials in accordance with the requirements of all Environmental Laws, except to the extent that such failure comply, obtain or renew, conduct or undertake would not reasonably be expected to result in a Material Adverse Effect.

(f)      Maintenance of Insurance.  Maintain, and ensure that each Vessel Owning Subsidiary will, at all times and at its own cost and expense cause to be carried and maintained insurance on its Collateral Vessel in accordance with the requirements of the relevant Ship Mortgage.

(g)      Visitation Rights.  (i) At any reasonable time and from time to time, permit any of the Administrative Agent or any of the Lenders, or representatives thereof, to examine and make copies of any abstracts from the records and books of account of any Loan Party and any of its Subsidiaries, and to discuss the affairs, finances and accounts of any Loan Party and any of its Subsidiaries with any of their respective officers or directors and with their independent certified public accountants, all at the expense of the Borrower; or (ii) permit visitation and inspection of the Collateral Vessels, in accordance with the terms of the applicable Ship Mortgage.

(h)      Keeping of Books.  Keep, and cause each of its Subsidiaries to keep, proper books of record and account, in which full and correct entries shall be made of all financial transactions and the assets and business of the Borrower and each such Subsidiary in accordance with US GAAP.

TEC000044

(i)      Maintenance of Properties, Etc.  Maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, all of its properties that are used or useful in the conduct of its business in good working order and condition, ordinary wear and tear excepted.

(j)      Further Assurances; Notices re: Name Change and Offices.

(i)      Promptly upon request by Administrative Agent, or any Lender through the Administrative Agent, do, and cause each other Loan Party to, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, conveyances, pledge agreements, mortgages, deeds of trust, trust deeds, assignments, financing statements and continuations thereof, termination statements, notices of assignment, transfers, certificates, assurances and other instruments as Administrative Agent, or any Lender through the Administrative Agent, may reasonably require from time to time in order to (A) carry out more effectively the purposes of the Loan Documents, or correct any material defect or error discovered therein, (B) to the fullest extent permitted by applicable law, subject any Loan Party's or any of its properties, assets, rights or interests (in each case constituting Collateral) to the Liens now or hereafter intended to be covered by any of the Collateral Documents, (C) perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and any of the Liens intended to be created thereunder and (D) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto the Administrative Agent, the Collateral Agent, the Security Trustee and the Secured Parties the rights granted or now or hereafter intended to be granted to any of them under any Loan Document or under any other instrument executed in connection with any Loan Document to which any Loan Party is or is to be a party.

(ii)      No fewer than thirty (30) days, or such shorter period as the Administrative Agent may determine, prior to the change of name of any Loan Party, notify the Administrative Agent and the Lenders of such change, and

(iii)      No fewer than thirty (30) days, or such shorter period as the Administrative Agent may determine, prior to the occurrence thereof, notify the Administrative Agent and the Lenders of the opening of an office of any Loan Party or of the change of address of the office described in Section 4.01(l)(iii) or any other office.

(k)      Compliance with Material Agreements.  Make all payments and otherwise perform all obligations in respect of all agreements, contracts and other arrangements material to the business of any Loan Party and to which such Loan Party is a party, keep such agreements and contracts in full force and effect, except, in any case, where the failure to do so, either individually or in the aggregate, would not be reasonably likely to have a Material Adverse Effect.

(l)      Appraisal Requirements.  The Borrower, at its sole expense, shall deliver an appraisal report covering the Collateral Vessels, with such appraisal to be prepared by an Approved Broker and indicating the Fair Market Value of each Collateral Vessel on or immediately prior to the Closing Date and semi-annually thereafter.  For the purposes of this Section 5.01(l) or elsewhere in any Loan Document where an appraisal of Collateral Vessels is required, the parties shall use an Approved Broker.

(m)      Vessel Disposition.

TEC000045

(i)      In respect of any Collateral Vessel, furnish to the Administrative Agent, as soon as available but in any event no later than fifteen (15) Business Days or such shorter period as determined by the Administrative Agent, prior to any Vessel Disposition, (A) a notice of such Vessel Disposition, (B) a certificate, in form and substance satisfactory to the Administrative Agent and signed by a Responsible Officer of the Borrower stating the agreed sale price for such Collateral Vessel and that the sale price of such Collateral Vessel is not less than the fair market value of such Collateral Vessel. The Administrative Agent shall promptly notify each Lender of any notice of Vessel Disposition.

(ii)      Upon receipt of the items required by clause (i) of this subparagraph (m) and subject to receipt of any payment required in accordance with the terms of Section 2.09 hereof and provided no Default shall have occurred and be continuing as a result of the relevant Vessel Disposition, the Administrative Agent shall, at the expense of the Borrower, (A) release the Collateral Vessel which is the subject of such notice of Vessel Disposition from the relevant Ship Mortgage, (B) terminate the respective Assignment of Earnings, Assignment of Insurances, Assignment of Charter (if any), Assignment of Management Agreement (if any), and any Manager Undertaking covering the same, and reassign to the relevant Loan Party, without any representation or warranty, all of the Collateral covered by the respective Assignment of Earnings, Assignment of Insurances, Assignment of Charter (if any) , Assignment of Management Agreement (if any),  and any Manager Undertaking, and (C) execute such other release documents as may be reasonably requested by the Borrower.  Each Lender agrees that the Administrative Agent shall be entitled to rely on any document submitted to it by the Borrower hereunder and that no approval of any Lender need be obtained in advance of any Vessel Disposition provided for in this subsection (m), provided the requirements set forth in this Section 5.10(m) have been met concurrently with such Vessel Disposition.

(n)      Owner and Operator Qualification; Managers.  (i) Each Loan Party which owns or operates, or will own or operate, a Collateral Vessel, is qualified, and at all times shall be qualified, to own and operate such Collateral Vessel in all jurisdictions in which such Collateral Vessel is flagged or operated.

(ii)      After termination of the relevant Charters, each Collateral Vessel shall be commercially and technically managed by the Manager, and the rights of the Manager (other than Parakou Ship Management Pte., as initial Manager on the date hereof) under any management agreement shall expressly be subordinated to the lien of the relevant Ship Mortgage and the rights of the Security Trustee.  The Borrower may change the Manager or enter into a technical or commercial management agreement only with written consent of the Administrative Agent (whose consent shall not be unreasonably withheld), and, in the event the Administrative Agent shall have consented and a new management agreement shall be in place, an appropriate executed Assignment of Management Agreement and Manager's Undertaking shall be delivered by the Borrower to the Administrative Agent.

(o)      Charters.  (i) Any Inter Company Charter whether now existing or entered into after the Execution Date, shall be subject and subordinate in all respects to (A) the lien of the Ship Mortgage in respect of the Collateral Vessel that is the subject of such Inter Company Charter and (B) the rights of the Security Trustee under such Ship Mortgage.

TEC000046

(ii)     There shall be no (A) bareboat chartering by PTI One or PTI Two of any Collateral Vessel, other than to the Charterers under the Charters, for a period (including optional renewals) in excess of four (4) months except under the PTI One Charter or the PTI Two Charter, and (B) time chartering by PTI One or PTI Two of any Collateral Vessel entered into after the Execution Date for a period (including optional renewals) in excess of thirty-six (36) months, without the prior written consent of the Majority Lenders, whose consent is not to be unreasonably withheld.

(iii)     The relevant Loan Party shall execute and deliver in favor of the Administrative Agent a specific assignment of each charter (bareboat or time) in excess of four (4) months duration (including all renewals) together with the consent of the charterer thereto, in substantially the form attached to the Assignment of Earnings attached hereto as Exhibit I.

(p)     <u>Accounts</u>. (i) The Borrower and each other Loan Party that owns a Collateral Vessel shall open and maintain for the duration of this Agreement a bank account in its name with the Administrative Agent (each an "<u>Earnings Account</u>" and collectively the "<u>Earnings Accounts</u>") and shall procure that all hires, freights, pool income and other sums, including without limitation, insurance proceeds, liquidated damages, and Requisition Compensation, payable in respect of a Collateral Vessel are credited to, and operating expenses deducted from, such Earnings Account. The amounts credited to the Earnings Accounts shall be freely available to the Borrower and each other Loan Party that owns a Collateral Vessel unless a Default has occurred and is continuing and notice has been given to the Borrower by the Administrative Agent that such amounts shall not be freely available.

(ii)     The Borrower each other Loan Party together shall accumulate the amounts described in sub-clause (i) of this Section 5.01(p) in one or more Earning Accounts or other account of the Borrower pledged to the Administrative Agent under a Loan Document; provided, notwithstanding the foregoing, the Borrower may withdraw and use amounts required to pay operating expenses from time to time, as long as the notice described in the relevant Account Pledge Agreement or Deposit Account Control Agreement has not been delivered by the Collateral Agent to the Borrower as set forth therein.

(q)     <u>Pari Passu</u>. This Agreement and the Facilities and the Obligations of the Borrower and the other Loan Parties hereunder and under the Loan Documents shall rank at least *pari passu* in right of payment with all present and future indebtedness of the Borrower and such other Loan Parties (except for mandatory obligations preferred by law).

(r)     <u>Collateral Vessels</u>. (i) No change of registration, flag, classification society, or technical or commercial management of any of the Collateral Vessels shall occur without the prior written consent of the Administrative Agent, such consent not to be unreasonably withheld.

(ii)     Each entity owning a Collateral Vessel shall remain, directly, a Wholly Owned Subsidiary of the Borrower.

(iii)     Each Collateral Vessel shall remain in class with a classification society acceptable to the Administrative Agent, free of any material overdue recommendations and qualifications affecting class unless otherwise agreed in writing by the Administrative Agent. The Borrower and each Vessel Owing Subsidiary shall cause such classification society to grant the Administrative Agent access to the class records and other information relation to the Collateral Vessels.

TEC000047

(iv)     The Managers and each Collateral Vessel shall possess all proper trading certificates.

(v)     Each entity owning a Collateral Vessel will at all times comply with the ISM Code and the International Ship and Port Facility Security Code as adopted by the IMO, as the same may be amended from time to time.

(vi)     Each Collateral Vessel shall remain 100% owned directly by PTI One or PTI Two, as the case may be.

(s)     Sanctions.  None of the Loan Parties or, as applicable, any of their respective directors, officers, or, to the knowledge of such Loan Parties, managers or other employees or consultants, or affiliates, any charterer of a Collateral Vessel (i) is a Sanctions Target, (ii) has any of its assets in a Sanctions Target in violation of applicable Sanction; or (iii) derives any operating income from investments in, or transactions with any Sanctions Target in violation of applicable Sanctions, or is in violation of any Sanctions, Anti-Corruption Law or Anti-Terrorism Laws.  No proceeds of the Facility will be used to fund any operations in, finance any investments or activities in or make any payment to, a Sanctions Target in violation of applicable Sanctions or in any manner that would cause any Secured Party to be in breach of Sanctions.

(t)     Right of First Refusal and First Negotiation.  (i) To the extent that during the first three (3) years following the Closing Date, the Borrower and/or any other member of the Wayfare Group receives a bona fide offer for any new ship financing transactions which the Administrative Agent and the Lenders are interested in pursuing (in each case, an "Offer"), the Borrower shall provide the Administrative Agent and the Lenders with a right of first refusal and first negotiation with respect to such Offer in the manner set forth in this Section 5.01(t).

(ii)     Not later than five (5) days after receipt of an Offer, the Borrower shall provide to the Administrative Agent a written notice (the "Offer Notice") which includes the name of the proposed financier, as well as the pricing and other the terms of payment.  In addition, the Offer Notice shall be accompanied by documented and verifiable proof of all the terms and conditions of the proposed bona fide ship financing transaction and copies of all documents pursuant to the terms of which the proposed transaction is intended to be made.  Not later than twenty (20) days after delivery of the Offer Notice, Administrative Agent shall notify the Borrower in writing of its desire to exercise the right of first refusal and first negotiation.  In the event the Administrative Agent fails to provide such notice within such time period, then the right of first refusal and first negotiation with respect to that Offer shall lapse and the Borrower shall be free to pursue completion of a transaction in connection with the Offer.  If the Administrative Agent provides timely notice of its desire to exercise its right of first refusal, then Administrative Agent shall proceed to close the ship financing transaction, at a price identical to and on terms no worse than those set forth in the Offer and the Offer Notice, not later than sixty (60) days from the date of the Offer Notice.  If the Administrative Agent  fails or is unable to close the transaction in such period, then, at the option of the Borrower, Administrative Agent 's right of first refusal with respect to that Offer shall lapse, and moreover, at the option of the Borrower, the right of first refusal and first negotiation provided to Administrative Agent  by this Section shall thereafter be considered null and void, and the Borrower shall thereafter be free to pursue any transaction respecting the project without any requirement to provide Administrative Agent  with a right of first refusal and first negotiation.

TEC000048

(u)     Business.  The Borrower and its Subsidiaries shall be engaged only in the business of ownership of vessels, the operation, technical and commercial management of vessels, or any material line of business substantially the same as those lines of business generally conducted by the Borrower and its Subsidiaries on the date hereof or any business substantially related or incidental thereto or reasonable extensions thereof.

(v)     Anti-Money Laundering.  The Borrower and the other Loan Parties shall comply with all anti-money laundering rules and regulations under the Patriot Act and under any European Union or other applicable law, rule or regulation.

(w)     Replacement Notes.  If any Note becomes mutilated, destroyed, lost or stolen, the Borrower shall, upon the written request of the affected Lender, execute and deliver in replacement thereof a new Note, in the same principal amount, dated the date of the Note being replaced and designated as issued under this Agreement. If the Note being replaced has become mutilated, such Note shall be surrendered to the Borrower. If the Note being replaced has been destroyed, lost or stolen, the affected Lender shall furnish to the Borrower and the Administrative Agent such security or indemnity as may be required by each of them to hold the Borrower and the Administrative Agent harmless and evidence satisfactory to the Borrower and the Administrative Agent of the destruction, loss or theft of such Note and of the ownership thereof; provided that if the affected Lender is an Initial Lender or an Eligible Assignee, the written notice of such destruction, loss or theft and such ownership and the written undertaking of such Lender delivered to the Borrower and the Administrative Agent to hold harmless the Borrower and Administrative Agent in respect of the execution and delivery of such new Note shall be sufficient evidence, security and indemnity.

(x)     ERISA.  Each Loan Party shall provide prompt written notice to the Administrative Agent in the event that such Loan Party or any of its ERISA Affiliates becomes aware that it has incurred or is reasonably likely to incur any liability with respect to any Plan or any other employee pension plan.

(y) Mandatory Securities Portfolio Contribution.  No later than the fifth Business Day following the Closing Date, the Borrower or Capser Senior shall pay, or cause to be paid, into the Securities Portfolio the sum of three million dollars ($3,000,000) (to bring the anticipated value of the Securities Portfolio to twenty-six million dollars ($26,000,000)).

Section 5.02.   Negative Covenants.  The Borrower hereby agrees that, so long as any Advance shall remain unpaid or any Lender shall have any Commitment hereunder:

(a)     Limitation on Indebtedness.  (i)  The Borrower will not create, incur, assume, permit, or suffer to exist any Indebtedness of itself or any Guarantor that is not a Vessel Owning Subsidiary except (A) in connection with the completion of the Transaction, (B) Indebtedness incurred under the terms of this Agreement, and (C) other Indebtedness of the Borrower or any Guarantor that is not a Vessel Owning Subsidiary, so long as (x) after giving effect to the incurrence of such Indebtedness, the Borrower, on a Consolidated basis is in compliance with the covenants set forth in Section 5.04 hereof, and (y) no Event of Default shall have occurred and be continuing after giving effect to the incurrence of such debt and the application of the proceeds thereof.

(b)     Limitation on Liens.  (i) The Borrower will not create, incur, assume or suffer to exist any Lien on any Collateral except for Permitted Liens.

TEC000049

(ii)     The Borrower will not permit any Guarantor that is not a Vessel Owning Subsidiary to create, incur, assume or suffer to exist any Lien on any Collateral except for Permitted Liens.

(iii)     The Borrower will not permit any Guarantor that is a Vessel Owning Subsidiary to create, incur, assume or suffer to exist any Lien on any of such Vessel Owning Subsidiary's assets except (collectively, "Permitted Liens"):

(A)     Liens for taxes, assessments or other charges which (x) are not at the time delinquent or are thereafter payable without penalty, or (y) are being contested in good faith by appropriate proceedings, provided with respect to taxes, assessments or other charges referred to in clause (x) and clause (y), that adequate reserves with respect thereto are maintained on the books of the Borrower or other applicable Loan Party in conformity with US GAAP;

(B)     Liens in favor of the Administrative Agent or the Collateral Agent or the Security Trustee to secure any or all Obligations created under the Loan Documents;

(C)     Other Liens arising in the ordinary course of the business of any of such Vessel Owning Subsidiary which (x) do not secure Indebtedness and (y) either (A) are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing the forfeiture or sale of any Collateral subject to any such lien, and with respect to which reserves are maintained on the books of the Borrower or other applicable Loan Party in conformity with US GAAP or (B) not more than thirty (30) days past due;

(D)     (x) any Inter Company Charter so long as the same shall be subject and subordinate in all respects to (i) the lien of the Ship Mortgage in respect of the Collateral Vessel that is the subject of such Inter Company Charter and (ii) the rights of the Collateral Agent or Security Trustee or Administrative Agent under such Ship Mortgage and (y) any other charter permitted by the terms of any Loan Document;

(E)     Liens for salvage, including contract salvage, and seamen's wages;

(F)     Liens arising out of the existence of judgments or awards in respect of which any Loan Party shall in good faith be prosecuting an appeal or proceedings for review or in respect of which there shall have been secured a subsisting stay of execution pending such appeal or proceedings, provided that, the aggregate amount of all cash (including the stated amount of all letters of credit) and the fair market value of all other property subject to such Liens does not exceed $100,000 at any time outstanding;

(G)     Liens in favor of any Related Party Lender; provided that all such Liens shall be subject and subordinate to the Liens in favor of the Administrative Agent and Collateral Agent securing any or all Obligations under the Loan Documents, and any such Related Party Lender shall have executed and delivered an intercreditor agreement satisfactory to the Administrative Agent.

TEC000050

(c)     <u>Limitation on Guaranty Obligations</u>.  The Borrower will not permit any Vessel Owning Subsidiary to create, incur, assume or suffer to exist any Guaranty Obligation except the Guaranty Obligations of the Guarantors under the Guaranty and those set forth in Schedule V hereto.

(d)     <u>Limitations on Fundamental Changes</u>.  (i)  The Borrower will not enter into any acquisition, merger, consolidation or amalgamation, or liquidate, wind-up or dissolve itself (or suffer any liquidation or dissolution) or convey, sell, lease or enter into any sale-leaseback transaction, assign, transfer or otherwise dispose of all or substantially all of the property, business or assets of the Borrower except if after the occurrence thereof each of the following is satisfied:

(A)     The Borrower is the surviving entity in the case of any such merger, consolidation or amalgamation;

(B)     in the case of any acquisition, merger, consolidation or amalgamation or conveyance, sale, lease or entrance into any sale-leaseback transaction, assignment, transfer or disposition, upon giving effect thereto (x) no Default shall have occurred and be existing hereunder and (y) the Borrower is in compliance with the covenants set forth in Section 5.04 hereof.

(ii)     The Borrower will not permit any Guarantor to enter into any acquisition, merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution) (except that any Guarantor may be merged or consolidated with or into one or more Wholly-Owned Subsidiaries of the Borrower (<u>provided</u> that (A) such Wholly-Owned Subsidiary into which or with whom such Guarantor has been consolidated or has merged shall not have any Indebtedness or other Obligations and (B) the continuing or surviving corporation or entity shall become a party to the Guaranty)), or convey, sell, lease or enter into any sale-leaseback transaction, assign, transfer or otherwise dispose of all or substantially all of such Guarantor's property, business or assets, except charters or subcharters "in" or "out" of Collateral Vessels, provided where required by the terms of Section 5.01(o)(iii), an Assignment of Charter together with notices and acknowledgments thereof, shall be executed and delivered to the Administrative Agent concurrently with the relevant Guarantor entering into such charters or subcharters.

(e)     <u>Limitation on Sale of Assets</u>.  The Borrower will not permit any Guarantor to convey, sell, lease to third parties (except charters of Collateral Vessels as described in Section 5.01(o)(ii) or enter into any sale-leaseback transaction, assign, transfer or otherwise dispose of any of its property, business or assets (including, without limitation, receivables and leasehold interests), whether now owned or hereafter acquired, to any Person ("<u>Asset Dispositions</u>"), except:

(i)     Asset Dispositions in the ordinary course of business consistent with past practices, so long as such assets do not constitute Collateral;

(ii)     Asset Dispositions of any Collateral Vessel (each a "<u>Vessel Disposition</u>", respectively) in compliance with Section 5.01(m) hereof.

(f)     <u>Limitation on Dividends and Other Payments</u>.  The Borrower will not declare or pay any dividend  on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any shares of any class of Equity Interests of the Borrower, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of

TEC000051

the Borrower or any Subsidiary, except only if each of the following conditions is met:  (i) after giving effect thereto no Default or Event of Default shall have occurred and be continuing or would result upon giving effect to such dividend payment, (ii) the aggregate amount expended by the Borrower in connection with the dividends and payments described above shall not exceed 25% of the Borrower's annual net income in any calendar year period, and (iii) no breach in any covenant set forth in Section 5.04 would result upon giving effect to such dividend payment.

(g)     Transactions at Arm's Length.  The Borrower will not, and will not permit any Guarantor to, enter into any transaction, including, without limitation, any purchase, sale, lease, lease-back, or exchange of property or the rendering of any service, with any entity that is not a Loan Party unless such transaction is upon fair and reasonable terms no less favorable to the Borrower or such Guarantor, as the case may be, than it would obtain in a comparable arm's-length transaction with a Person not an Affiliate.

(h)     Subsidiaries.  The Borrower will not permit any Guarantor to create, acquire or permit to exist any Subsidiary other than Subsidiaries in existence on the Closing Date.

(i)     Amendments of Constitutive Documents.  The Borrower will not amend, or permit any of the Guarantors to amend, its respective certificate of incorporation or bylaws or other constitutive documents, in each case, if such amendment would be materially adverse to the interests of the Secured Parties.

(j)     Fiscal Year.  The Borrower will not, and will not make or permit, or permit any Guarantor to, make or permit, any change in its respective fiscal year from a calendar year.

(k)     Speculative Transactions.  The Borrower will not, and will not permit any Guarantor to, engage in any transaction involving commodity options or futures contracts or any similar speculative transactions, other than hedging arrangements entered into in the ordinary course of business consistent with past practices.

(l)     Investments.  The Borrower will not, and will not permit any Vessel Owning Subsidiary to, engage in any advance, loan, extension of credit or capital contribution to, or otherwise acquire any stock, bonds, notes, debentures or other securities of or any assets constituting a business unit of or make any other investment in, any Person (all of the foregoing, collectively, "Investments") except:

(i)     Investments in the form of trade credits in the ordinary course of business; or

(ii)     Investments in Cash Equivalents; or

(iii)     loans to the Borrower or to another Vessel Owning Subsidiary.

(m)     No Change in Management.  (i) Without the prior written consent of the Administrative Agent, such consent to be at its sole discretion, the Borrower will not, and will not permit any other Loan Party, or any other person, to (A) change the senior management of any of the Borrower or such Loan Party, or (B) change, amend, restructure or modify the compensation agreements for the senior management of any Loan Party.

(ii)     All compensation agreements for the senior management of any Loan Party, including the Key Man, shall at all times be satisfactory to the Administrative Agent.

TEC000052

(n)    Debt and Capital leases.  The Borrower and the other Loan Parties will not enter into any debt or capital lease transactions except with the prior written consent of the Administrative Agent. Any such  previously approved debt or capital lease transactions shall be (i) on terms acceptable to the Administrative Agent in its sole discretion, and (ii )subject to satisfactory intercreditor agreements executed and delivered amongst such parties as the Administrative Agent deems necessary.

(o)    ERISA.  No Loan Party nor any of its ERISA Affiliates shall sponsor, maintain or become obligated to contribute to any Plan or any other employee pension plan.

Section 5.03.    Reporting Requirements. So long as any Advance or any other Obligation of any Loan Party under any Loan Document shall remain unpaid or any Lender shall have any Commitment hereunder, the Borrower will furnish to the Administrative Agent and the Lenders:

(a)    Default Notice.  As promptly as possible but in any event within five (5) calendar days after knowledge by a Responsible Officer of the Borrower of the occurrence of any Default continuing on the date of such statement, a statement of the chief financial officer of the Borrower setting forth details of such Default and the action that the Borrower has taken and proposes to take with respect thereto.

(b)    Financial Reporting.

(i)    Securities Portfolio.  A daily report on the balance of the Securities Portfolio held with the Securities Intermediary.

(ii)    Monthly Financials.  As soon as available and in any event within fifteen (15) days after the close of each fiscal month, a copy of the  internally-prepared monthly financial statements of the Borrower and its Subsidiaries, including a balance sheet and related profit and loss and surplus statements with variance analysis to projections.

(iii)    Semi-Annual Financial Projections.  As soon as available and in any event not less than thirty (30) days prior to the beginning of each fiscal half year, semi-annual budget and financial projections of the Borrower presented with twelve (12) month forward-looking information.

(iv)    Annual Financials.  As soon as available and in any event within one hundred and twenty (120) days after the end of each fiscal year, a copy of the annual audit report for such year for the Borrower and its Subsidiaries prepared in accordance with US GAAP, including therein a Consolidated and consolidating balance sheet of the Borrower and its Subsidiaries as of the end of such fiscal year and a Consolidated and consolidating statement of income and a Consolidated statement of cash flows of the Borrower and its Subsidiaries for such fiscal year, in each case accompanied by an opinion unqualified as to the scope of audit of KPMG LLP or other independent public accountants of recognized standing reasonably acceptable to Administrative Agent.

(v)    Personal Net Worth Statement.  As soon as available and in any event within ninety (90) days after the end of each fiscal year, a certified statement of personal net worth in respect of the Key Man.

TEC000053

(c)     With the financial statements provided pursuant to subparagraphs (i) through (iv) above, (i) a certificate of the chief financial officer or treasurer stating that no Default has occurred and is continuing or, if a Default has occurred and is continuing, a statement as to the nature thereof and the action that the Borrower has taken and proposes to take with respect thereto and (ii) a Certificate of Compliance respecting and, attaching the computations used by the Borrower in determining compliance with the covenants contained in Section 5.04, provided that in the event of any change in US GAAP used in the preparation of such financial statements, the Borrower shall also provide, together with such financial statements, if necessary for the determination of compliance with Section 5.04, a statement of reconciliation conforming such financial statements to US GAAP.

(d)     Confirmation of Class.  Annually within thirty (30) days after the beginning of each calendar year, commencing with the calendar year after the Closing Date, a certificate of Confirmation of Class for each Collateral Vessel confirming that such Collateral Vessel is in class without overdue recommendations affecting such class.

(e)     Litigation.  Promptly after the commencement thereof, notice of all actions, suits, investigations, litigation and proceedings before any Governmental Authority affecting any Loan Party or any of its Subsidiaries of the type described in Section 4.01(f), and promptly after the occurrence thereof, notice of any adverse change in the status or the financial effect on any Loan Party or any of its Subsidiaries of the Disclosed Litigation from that described on Schedule VI hereto.

(f)     Borrowing Base Certificate.  As soon as available and in any event within ten (10) days after the close of each calendar month, and with each request for a Revolving Credit Advance, a Borrowing Base Certificate certified by a Responsible Officer.

(g)     Environmental Conditions.  Promptly after the assertion or occurrence thereof, notice of any (x) material spillage or emission of a Hazardous Substance from any Collateral Vessel or other vessel owned or operated by an Affiliate of the Borrower or (y) any Environmental Action against or of any noncompliance by any Loan Party or any of its Subsidiaries or any Collateral Vessel with any Environmental Law or Environmental Permit that could (i) reasonably be expected to have a Material Adverse Effect or (ii) cause any property described in the Mortgages to be subject to any material Lien or restrictions on ownership, occupancy, use or transferability under any Environmental Law.

(h)     Insurance.  As soon as available and in any event within thirty (30) days after the end of each fiscal year, a report summarizing the insurance coverage (specifying type, amount and carrier) in effect for each Loan Party and its Subsidiaries and containing such additional information as the Administrative Agent (or any Lender through the Administrative Agent) may reasonably specify.

(i)     Other Information.  Such other information as the Administrative Agent, or any Lender through the Administrative Agent, may from time to time reasonably request, including, without limitation:

(i)     information respecting the business, condition (financial or otherwise), operations, performance, properties or prospects of any Loan Party or any of its Subsidiaries;

(ii)     sales journals, detailed accounts receivables and aged accounts payable reports of any Loan Party or any of its Subsidiaries;

(iii)     a summary of the terms of all charter party agreements then in effect;

TEC000054

(iv)     information respecting the maintenance of the Collateral Vessels, incident and accident reports, near-miss records and trading routes;

(v)     copies of correspondence between the Borrower and/or the Vessel Owing Subsidiaries and the Manager, the Charterers, the Borrower's partners, creditors and investors;

(vi)     copies of reports sent to the Borrower's shareholders and directors; and

(vii)     such further schedules, documents and information as the Administrative Agent may reasonably request.

Section 5.04.     Financial Covenants.  So long as any Advance or any other Obligation of any Loan Party under any Loan Document shall remain unpaid, or any Lender shall have any Commitment hereunder, the Borrower will:

(a)     Securities Portfolio.  Maintain, or cause Capser Senior to maintain, at all times, the Securities Portfolio having a value of not less than $22,500,000.

(b)     Minimum Liquidity.  Maintain, at all times, no less than $500,000 in cash and/or Cash Equivalents on hand, tested on the Closing Date and monthly thereafter.

(c)     EBITDA.  Maintain, at the end of each fiscal quarter of the Borrower, Consolidated EBITDA measured on a trailing three (3) month basis of $1,400,000, tested for the quarter ending March 31, 2017, and quarterly thereafter.

(d)     Vessel Fair Market Value.  From and after  the anniversary of the Closing Date, ensure the Fair Market Value of the Collateral Vessels shall at all times be equal to 140% of the then aggregate outstanding principal amount under the Term Loan Facility (the "Fair Market Value Coverage Ratio"). The Fair Market Value Coverage Ratio shall be determined on the first anniversary of the Closing Date and semi-annually thereafter, and upon the request of the Administrative Agent.  The Borrower shall deliver to the Administrative Agent a certificate of a Responsible Officer of the Borrower, together with back-up calculations and copies of the appraisal from an Approved Broker on each date on which the Fair Market Value Coverage Ratio is required to be determined. No appraisal that is the basis for any calculation shall be older than 30 days prior to the date of the relevant compliance certificate.  The Borrower shall pay the cost of appraisals.

ARTICLE VI

EVENTS OF DEFAULT

Section 6.01.     Events of Default.  If any of the following events ("Events of Default") shall occur and be continuing:

(a)     (i) the Borrower shall fail to pay any principal of any Advance when the same shall become due and payable, whether at the due date thereof or on a date fixed for prepayment thereof or by acceleration or otherwise, (ii) the Borrower shall fail to pay any interest on any Advance when the same shall become due and payable under any Loan Document within one (1) Business Day after the same shall become due and payable, or (iii) any Loan Party shall fail to make any payment (other than

TEC000055

principal or interest) when the same shall become due and payable under any Loan Document, in each case under this clause (iii) within three (3) Business Days after the same shall become due and payable; or

(b)     any representation or warranty made by any Loan Party (or any of its officers) under or in connection with any Loan Document shall prove to have been incorrect in any material respect when made; or

(c)     the Borrower shall fail to perform or observe any term, covenant or agreement contained in Section 2.15, 5.01(a), (d), (e), (f), (other than (f) (iii)), (m), (q), (u) or (v), 5.02, or 5.04; or

(d)     any Loan Party shall fail to perform or observe any other term, covenant or agreement contained in any Loan Document on its part to be performed or observed unless such failure is remedied (if capable of being remedied in the reasonable opinion of the Administrative Agent) within thirty (30) days after the Administrative Agent shall have given written notice to the Borrower of such failure; or

(e)     any Loan Party or any of its Subsidiaries shall fail to pay any principal of, premium or interest on or any other amount payable in respect of any Indebtedness of such Loan Party or such Subsidiary (as the case may be) that is outstanding in a principal amount of at least $500,000 either individually or in the aggregate (but excluding Indebtedness outstanding hereunder), when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Indebtedness; or any other event shall occur or condition shall exist under any agreement or instrument relating to any such Indebtedness and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such event or condition is to accelerate, or to permit the acceleration of, the maturity of such Indebtedness or otherwise to cause, or to permit the holder thereof to cause, such Indebtedness to mature; or

(f)     (i) any Loan Party shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its assets, or any Loan Party shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against any Loan Party any case, proceeding or other action of a nature referred to in clause (i) above which (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of sixty (60) days; or (iii) there shall be commenced against any Loan Party any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of an order for relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof; or (iv) any Loan Party shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii) or (iii) above; or (v) any Loan Party shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due; or

(g)     one or more judgments or decrees shall be entered against the Borrower or any of its Subsidiaries involving in the aggregate a liability of $500,000 or more (calculated after deducting therefrom any amount that will be paid by a recognized protection and indemnity club that is a member of the International Group Agreement or any insurer rated at least B++ by A.M. Best Company, or the equivalent thereof provided by a rating service whose ratings of insurance companies are internationally

TEC000056

recognized or any insurer acceptable to the Administrative Agent, if such insurer has been notified of, and has not disputed the claim made for payment of, the amount of such judgment or decree) and such judgments or decrees involving in the aggregate $500,000 or more shall not have been vacated, discharged, stayed or bonded pending appeal within sixty (60) days from the entry thereof; or

(h)     this Agreement or any other Loan Document shall cease to be in full force and effect, shall be determined by any court to be void, voidable or unenforceable, or any Loan Party shall assert in writing any defense to any of its obligations under any Loan Document to which it is a party or otherwise contest its liability thereunder, or any such Loan Party shall rescind or revoke in writing (or attempt to rescind or revoke in writing) any of its obligations under any Loan Document, whether with respect to future transactions or otherwise; or

(i)     there shall occur and be continuing an "Event of Default" as defined in any Ship Mortgage; or

(j)     except as otherwise permitted hereunder, the Secured Parties shall cease to have a first-priority perfected security interest in any Collateral; or

(k)     a Material Adverse Effect shall have occurred and be continuing; or

(l)     there shall be unrest or instability in Hong Kong or such other jurisdiction of registration of the Collateral Vessels;

(m)     a Change of Control shall occur; or

(n)     the Key Man shall die or become disabled for a period exceeding 180 days;

then, and in any such event, (A) if such event is an Event of Default specified in clause (i) or (ii) of paragraph (f) above, automatically the Commitments shall immediately terminate and the Advances hereunder (with accrued interest thereon) and all other amounts owing under this Agreement, the Notes and any other Loan Document shall immediately become due and payable, and (B) if such event is any other Event of Default, either or both of the following actions may be taken: (i) the Administrative Agent may, or upon the request of the Majority Lenders, the Administrative Agent shall, by notice to the Borrower, declare the Commitments to be terminated forthwith, whereupon the Commitments shall immediately terminate; and (ii) the Administrative Agent may, by notice of default to the Borrower, declare the Loans hereunder (with accrued interest thereon) and all other amounts owing under this Agreement, the Notes and any other Loan Document to be due and payable forthwith, whereupon the same shall immediately become due and payable.  Except as expressly provided above in this Section, presentment, demand, protest and all other notices of any kind are hereby expressly waived.

Section 6.02.     Remedies.  Upon the occurrence and existence of any Event of Default hereunder, the Administrative Agent, the Collateral Agent, the Security Trustee or the Secured Parties may exercise any and all remedies granted under the terms of any Loan Document or otherwise by applicable law.

Section 6.03.     Application of Proceeds.  Following an Event of Default, all monies and proceeds of any enforcement action shall be applied by the Administrative Agent on behalf of the Secured Parties against all or any part of the Obligations, in the following order:

(i)     first, in or towards payment of all costs, charges and expenses incurred or paid by the Administrative Agent, the Collateral Agent (or the Security Trustee, in the case of certain Ship Mortgages, as the case may be), the Payment

TEC000057

Agent or the Lenders in connection with or incidental to the proper exercise or performance or attempted exercise or performance by the Administrative Agent of any of the rights, powers or remedies hereby conferred or conferred by any other Loan Document or by law or in connection with or incidental to the enforcement or realization of the security hereby constituted or constituted by any other Loan Document;

(ii)     second, to the payment of any amounts (other than principal, interest, or any amounts described in clause first hereof) due and payable and unpaid under any Loan Document, including but not limited to, any Break Funding Costs or amounts due under Sections 2.10, 2.11, 2.13 or 8.04(c) hereof;

(iii)     third, in or towards payment pro rata of any interest then due and payable and unpaid under any Loan Document;

(iv)     fourth, in or towards payment pro rata of any principal sum of the Term Loan Advance then due and payable and unpaid;

(v)     fifth, in or towards payment pro rata of any principal sum of any Revolving Credit Advances then due and payable and unpaid; and

(vi)     sixth, any surplus of such cash or cash proceeds held by the Administrative Agent or any other Secured Party and remaining after payment in full of all the Obligations, and the termination of all Commitments (if not then already terminated), shall be paid over to the Borrower or to whomsoever may be lawfully entitled to receive such surplus.

## ARTICLE VII

## THE ADMINISTRATIVE AGENT

Section 7.01.    Authorization and Action.

(a)     Each Lender (in its capacity as a Lender) hereby appoints and authorizes the Administrative Agent (and the Security Trustee, or TEC, in the case of certain Ship Mortgages as the case may be) to take such action as agent on its behalf and to exercise such powers and discretion under this Agreement and the other Loan Documents as are delegated to the Administrative Agent by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto. As to any matters not expressly provided for by the Loan Documents (including, without limitation, enforcement or collection of the Notes), the Administrative Agent (and the Security Trustee or TEC, in the case of certain ship mortgages as the case may be) shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Majority Lenders, and such instructions shall be binding upon all Lenders and all holders of Notes; provided, however, that the Administrative Agent (and the Security Trustee or TEC, in the case of certain ship mortgages as the case may be) shall not be required to take any action that exposes it to personal liability or that is contrary to this Agreement or applicable law. The Administrative Agent agrees to give to each Lender prompt notice of each notice given to it by the Borrower pursuant to the terms of this Agreement. Notwithstanding anything in this Agreement to the contrary, as set forth in Section 8.01, the Administrative Agent agrees to notify and consult with the Majority Lenders on any provision or decision within this Agreement requiring the

TEC000058

Administrative Agent's action, approval or consent unless such action, approval or consent requires the unanimous consent of all Lenders.

(b)      The provisions of this Article VII shall apply to, and enure to the benefit of, and be binding on, the Security Trustee (and TEC in the case of certain Ship Mortgages) as though it were named herein to the same extent such provisions apply to, and enure to the benefit of, and are binding on, the Administrative Agent.

Section 7.02.      Agent's Reliance, Etc.  Neither the Administrative Agent nor any of its respective directors, officers, agents or employees shall be liable for any action taken or omitted to be taken by it or them under or in connection with the Loan Documents, except for its or their own gross negligence or willful misconduct.  Without limitation of the generality of the foregoing, the Administrative Agent: (a) may treat the payee of any Note as the holder thereof until the Administrative Agent receives and accepts an Assignment and Acceptance entered into by the Lender that is the payee of such Note, as assignor, and an Eligible Assignee, as assignee, as provided in Section 8.07; (b) may consult with legal counsel (including counsel for any Loan Party), independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts; (c) makes no warranty or representation to any Lender and shall not be responsible to any Lender for any statements, warranties or representations (whether written or oral) made in or in connection with the Loan Documents; (d) shall not have any duty to ascertain or to inquire as to the performance, observance or satisfaction of any of the terms, covenants or conditions of any Loan Document on the part of any Loan Party or the existence at any time of any Default under the Loan Documents or to inspect the property (including the books and records) of any Loan Party; (e) shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the perfection or priority of any lien or security interest created or purported to be created under or in connection with, any Loan Document or any other instrument or document furnished pursuant thereto; and (f) shall incur no liability under or in respect of any Loan Document by acting upon any notice, consent, certificate or other instrument or writing (which may be by telegram, telecopy or telex) believed by it to be genuine and signed or sent by the proper party or parties.

Section 7.03.      TEC and Affiliates.  With respect to its Commitments, the Advances made by it and the Notes issued to it, if any, TEC shall have the same rights and powers under the Loan Documents as any other Lender and may exercise the same as though it were not the Administrative Agent or Security Trustee; and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated, include TEC in its individual capacity.  So long as it is a Lender, TEC and its affiliates may accept deposits from, lend money to, act as trustee under indentures of, accept investment banking engagements from and generally engage in any kind of business with, any Loan Party, any of its Subsidiaries and any Person that may do business with or own securities of any Loan Party or any such Subsidiary, all as if TEC were not the Administrative Agent and without any duty to account therefor to the Lenders.  The Administrative Agent shall not have any duty to disclose any information obtained or received by it or any of its Affiliates relating to any Loan Party or any of its Subsidiaries to the extent such information was obtained or received in any capacity other than as the Administrative Agent.

Section 7.04.      Lender Credit Decision.  Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender and based on the financial statements referred to in Section 4.01 and such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement.

TEC000059

Section 7.05.   Indemnification.  (a)  Each Lender severally agrees to indemnify Administrative Agent (to the extent not promptly reimbursed by the Borrower) from and against such Lender's ratable share (determined as provided below) of any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against the Administrative Agent in any way relating to or arising out of the Loan Documents or any action taken or omitted by Administrative Agent under the Loan Documents (collectively, the "Indemnified Costs"); provided, however, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from Administrative Agent's gross negligence or willful misconduct as found in a final, non-appealable judgment by a court of competent jurisdiction.  Without limitation of the foregoing, each Lender agrees to reimburse the Administrative Agent promptly upon demand for its ratable share of any costs and expenses (including, without limitation, fees and expenses of counsel) payable by the Borrower under Section 8.04, to the extent that Administrative Agent is not promptly reimbursed for such costs and expenses by the Borrower.  In the case of any investigation, litigation or proceeding giving rise to any Indemnified Costs, this Section 7.05 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person.

(b)     For purposes of this Section 7.05, the Lenders' respective ratable shares of any amount shall be determined, at any time, according to the sum of (i) the aggregate principal amount of the Advances outstanding at such time and owing to the respective Lenders and (ii) the aggregate unused portions of their respective Revolving Credit Commitments at such time.  The failure of any Lender to reimburse Administrative Agent, as the case may be, promptly upon demand for its ratable share of any amount required to be paid by the Lenders to Administrative Agent, as the case may be, as provided herein shall not relieve any other Lender of its obligation hereunder to reimburse Administrative Agent, as the case may be, for its ratable share of such amount, but no Lender shall be responsible for the failure of any other Lender to reimburse Administrative Agent, as the case may be, for such other Lender's ratable share of such amount.  Without prejudice to the survival of any other agreement of any Lender hereunder, the agreement and obligations of each Lender contained in this Section 7.05 shall survive the payment in full of principal, interest and all other amounts payable hereunder and under the other Loan Documents.

(c)     If the Administrative Agent has been reimbursed by the Borrower or any third party, then (i) the Administrative Agent shall, within three Business Days, notify details of the reimbursement to the Lenders, and (ii) the Administrative Agent shall distribute proportionately the recovered amount to the Lenders.

Section 7.06.   Successor Administrative Agent.  Administrative Agent may resign at any time by giving written notice thereof to the Lenders and the Borrower; provided, however, that any removal of the Administrative Agent will not be effective until it has also been replaced as Administrative Agent (including as Successor Trustee under the Security Trust Agreement and as mortgagee under certain Ship Mortgages) and released from all of its obligations in respect thereof.  In addition, the Majority Lenders shall have the right to remove the Administrative Agent for cause and to appoint a successor Administrative Agent in accordance with this Section 7.06.  Upon any such resignation or removal, the Majority Lenders shall have the right to appoint a successor Administrative Agent.  If no successor Administrative Agent shall have been so appointed by the Majority Lenders, and shall have accepted such appointment, within 30 days after the retiring Administrative Agent's giving of notice of resignation or the Majority Lenders' removal of the retiring Administrative Agent, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent, which shall meet the standards to be an Eligible Assignee, have a combined capital and surplus of at least $500,000,000 and be reasonably acceptable to the Majority Lenders and the Borrower.  Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent and, in the case of a

TEC000060

successor Administrative Agent, upon the execution and filing or recording of such financing statements, or amendments thereto, and such amendments or supplements to the Ship Mortgages and the Security Trust Agreement, and such other instruments or notices, as may be necessary or desirable, or as the Majority Lenders may request, in order to continue the perfection of the Liens granted or purported to be granted by the Collateral Documents, such successor Administrative Agent shall succeed to and become vested with all the rights, powers, discretion, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations under the Loan Documents.  If within 45 days after written notice is given of the retiring Administrative Agent's resignation or removal under this Section 7.06 no successor Administrative Agent shall have been appointed and shall have accepted such appointment, then on such 45th day (a) the retiring Administrative Agent's resignation or removal shall become effective, (b) the retiring Administrative Agent shall thereupon be discharged from its duties and obligations under the Loan Documents and (c) the Majority Lenders shall thereafter perform all duties of the retiring Administrative Agent under the Loan Documents until such time, if any, as the Majority Lenders appoint a successor Administrative Agent as provided above.  After any retiring Administrative Agent's resignation or removal hereunder as Administrative Agent shall have become effective, the provisions of this Article VII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under this Agreement.  The institution acting as Administrative Agent shall always also act as Security Trustee under the Security Trust Agreement.

ARTICLE VIII

MISCELLANEOUS

Section 8.01.    <u>Amendments, Etc.</u>  (a)   No amendment or waiver of any provision of any Loan Document, nor consent to any departure by any Loan Party therefrom or any discharge or termination, shall in any event be effective unless the same shall be in writing and signed by the Administrative Agent, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  The Administrative Agent may execute any amendment or waiver or give any consent except where the prior written consent of the Lenders is required under Section 8.01(b).

(b)    Notwithstanding the immediately prior sentence, however, no amendment, waiver or consent shall, unless in writing and signed by all the Lenders affected by such amendment, waiver or consent, do any of the following:  (i) increase the Commitments of the Lenders or subject the Lenders to any additional obligations, (ii) reduce the principal of, or interest on, the Notes or any fees or other amounts payable hereunder to the Lenders, (iii) postpone any date fixed for any payment of principal of the Notes, (iv) change the percentage of the Commitments or of the aggregate unpaid principal amount of the Notes, or the number of Lenders, that in each case shall be required for the Lenders or any of them to take any action hereunder, (v) extend the Availability Date or the Maturity Date, (vi) amend the definition of Majority Lenders, (vii) release any Collateral (except Collateral or the release of any Vessel Owning Subsidiary and the equity interests thereof in accordance with the terms of Section 5.01(m)), (viii) amend Section 2.14 or Section 6.03 hereof, (ix) amend this Section 8.01, or (x) permit the assignment by the Borrower or any Guarantor of its obligations under any Loan Document, <u>provided</u> ,that no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above to take such action, affect the rights or duties of the Administrative Agent in its capacity as Administrative Agent or Collateral Agent under this Agreement or any Note or any other Loan Document.

(c)    Notwithstanding anything herein to the contrary, the Administrative Agent may, with the consent of the Borrower, but without the consent of the Majority Lenders or any Lender, amend

57
Senior Secured Credit Facility

this Agreement or any other Loan Document in order to fix any immaterial errors contained herein or therein.

(d)     If, in connection with any proposed amendment, waiver, departure, discharge or termination of or to any of the provisions of this Agreement or any other Loan Document as contemplated by clauses (i) through (x), inclusive of Section 8.01(b), the consent of the Majority Lenders is obtained but the consent of one or more of such other Lenders whose consent is required is not obtained, then the Borrower shall have the right, so long as all non-consenting Lenders whose individual consent is required are treated as described in either clause (A) or (B) below, to either (A) replace each such non-consenting Lender or Lenders with one or more Eligible Assignees so long as at the time of such replacement, each such Eligible Assignee consents to the proposed amendment, waiver, departure, discharge or termination or (B) terminate such non-consenting Lender's Commitment and repay the Advances of such Lender which gave rise to the need to obtain such Lender's consent, provided that, unless the Commitments which are terminated and Advances which are repaid pursuant to preceding clause (B) are immediately replaced in full at such time through the addition of new Lenders or the increase of the Commitments and/or outstanding Advances of existing Lenders (who in each case must specifically consent thereto), then in the case of any action pursuant to preceding clause (B), the Majority Lenders (determined after giving effect to the proposed action) shall specifically consent thereto.

Section 8.02.     Notices, Etc.  All notices and other communications provided for hereunder shall be in writing (including email or facsimile) and sent by a prepaid nationally recognized overnight courier, emailed or facsimiled, or delivered:

if to the Borrower, at its address at:

> 2505 46th Street West
> Billings, Montana 59106
> Facsimile:  +406-371-9421
> Email:  tcapser@wayfareshipping.com;

if to any other Loan Party:
c/o the Borrower at the aforementioned address;

if to any Initial Lender, at its Applicable Lending Office specified opposite its name on Schedule II hereto;

if to any other Lender, at its Applicable Lending Office specified in the Assignment and Acceptance pursuant to which it became a Lender;

if to the Administrative Agent (and the Payment Agent, the Collateral Agent, the Security Trustee or TEC in the case of certain Ship Mortgages), at its address at:

> Brookfield Place
> TD Canada Trust Tower
> 161 Bay Street
> Suite 3930
> Toronto, ON M5J 2S1
> Canada
> Attention:  Managing Director
> Facsimile:  416-981-3393;

TEC000062

or, as to the Borrower or Administrative Agent, at such other address as shall be designated by such party in a written notice to the other parties and, as to each other party, at such other address as shall be designated by such party in a written notice to the Borrower and the Administrative Agent. All such notices and communications shall, when mailed, be sent by a nationally recognized overnight courier, or emailed or facsimiled, and be effective when deposited in the mails, delivered to such courier, or emailed or facsimiled, respectively, except that notices and communications to the Administrative Agent pursuant to Articles II, III or VIII shall not be effective until received by the Administrative Agent, as the case may be. Delivery by telecopier of an executed counterpart of any amendment or waiver of any provision of this Agreement or the Notes or of any Exhibit hereto to be executed and delivered hereunder shall be effective as delivery of a manually executed counterpart thereof. All notices and communications given under this Agreement unless submitted in the English language, shall be accompanied by one English translation for each copy of the foregoing so submitted; provided, that the English version of all such notices, communications, evidences and other documents shall govern in the event of any conflict with the non-English version thereof.

Each Lender agrees that notice to it (as provided in the next sentence) specifying that any communications have been posted to the Platform shall constitute effective delivery of such communications to such Lender for purposes of the Loan Documents. Each Lender agrees to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's email address to which the foregoing notice may be sent by electronic transmission and (ii) that the foregoing notice may be sent to such email address.

Section 8.03.   No Waiver; Remedies, Entire Agreement.   (a)   No failure on the part of any Lender or Administrative Agent to exercise, and no delay in exercising, any right hereunder or under any Note or any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

(b)   This Agreement and the other Loan Documents constitute the entire agreement of the parties with respect hereto.

Section 8.04.   Costs and Expenses.  (a)  The Borrower agrees to pay on demand (i) all costs and expenses of the Administrative Agent, the Collateral Agent, the Security Trustee, and the Payment Agent in connection with the preparation, execution, delivery, administration, modification and amendment of, or any consent or waiver under, the Loan Documents and any commitment letter relating thereto (including, without limitation, (A) all due diligence, collateral review, syndication (including costs and expenses related to printing, distribution and bank meetings), transportation, computer, duplication, appraisal, audit, insurance, consultant, independent insurance advisor fee, search, filing and recording fees and expenses and (B) the reasonable fees and expenses of counsel for the Administrative Agent with respect thereto, with respect to advising the Administrative Agent, the Security Trustee or the Collateral Agent as to its rights and responsibilities, or the perfection, protection or preservation of rights or interests, under the Loan Documents, with respect to negotiations with any Loan Party or with other creditors of any Loan Party or any of its Subsidiaries arising out of any Default or any events or circumstances that may give rise to a Default and with respect to presenting claims in or otherwise participating in or monitoring any bankruptcy, insolvency or other similar proceeding involving creditors' rights generally and any proceeding ancillary thereto) and (ii) all costs and expenses of Administrative Agent, the Collateral Agent, the Security Trustee and each other Secured Party in connection with the enforcement of the Loan Documents, whether in any action, suit or litigation, or any bankruptcy, insolvency or other similar proceeding affecting creditors' rights generally (including, without limitation, the reasonable fees and expenses of counsel for the Administrative Agent and each other Secured Party with respect thereto).

TEC000063

(b)     The Borrower agrees to indemnify, defend and save and hold harmless the Administrative Agent, the Security Trustee, the Collateral Agent, each Lender and each other Secured Party and each of their Affiliates and their respective officers, directors, employees, agents and advisors (each, an "Indemnified Party") from and against, and shall pay on demand, any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and expenses of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) (i) the Transaction, the Facilities, the actual or proposed use of the proceeds of the Advances, the Loan Documents or any of the transactions contemplated thereby or (ii) the actual or alleged presence of Hazardous Materials on any property of any Loan Party or any of its Subsidiaries or any Environmental Action relating in any way to any Loan Party or any of its Subsidiaries, except to the extent such claim, damage, loss, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 8.04(b) applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Loan Party, its directors, shareholders or creditors or an Indemnified Party or any other Person, whether or not any Indemnified Party is otherwise a party thereto. The Borrower also agrees and will ensure that neither it nor any of its Subsidiaries will assert any claim against the Administrative Agent, the Collateral Agent, the Payment Agent, any Lender, the Security Trustee (or TEC in the case of certain Ship Mortgages), any other Secured Party or any of their Affiliates, or any of their respective officers, directors, employees, agents and advisors, on any theory of liability, for special, indirect, consequential or punitive damages arising out of or otherwise relating to the Facilities, the actual or proposed use of the proceeds of the Advances, the Loan Documents or any of the transactions contemplated by the Loan Documents.

(c)     If any payment of principal of any Advance is made by the Borrower to or for the account of a Lender other than on the last day of the Interest Period for such Advance, as a result of a payment, acceleration of the maturity of the Notes pursuant to Section 6.01 or for any other reason, or by an Eligible Assignee to a Lender other than on the last day of the Interest Period for such Advance upon an assignment of rights and obligations under this Agreement pursuant to Section 8.07 as a result of a demand by the Borrower pursuant to Section 8.07(a), or if the Borrower fails to make any payment or prepayment of an Advance for which a notice of prepayment has been given or that is otherwise required to be made, whether pursuant to Section 2.08, 2.09 or 6.01 or otherwise, the Borrower shall, upon demand by such Lender (with a copy of such demand to the Administrative Agent), pay to the Administrative Agent for the account of such Lender any amounts required to compensate such Lender for any additional losses, costs or expenses that it may reasonably incur as a result of such payment or such failure to pay or prepay, as the case may be, including, without limitation, any loss (including loss of anticipated profits), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by any Lender to fund or maintain such Advance.

(d)     If any Loan Party fails to pay when due any costs, expenses or other amounts payable by it under any Loan Document, including, without limitation, fees and expenses of counsel and indemnities, such amount may be paid on behalf of such Loan Party by the Administrative Agent or any Lender, in its sole discretion.

(e)     Without prejudice to the survival of any other agreement of any Loan Party hereunder or under any other Loan Document, the agreements and obligations of the Borrower contained in Sections 2.10, 2.11 and 2.13 and this Section 8.04 shall survive the payment in full of principal, interest and all other amounts payable hereunder and under any of the other Loan Documents.

TEC000064

Section 8.05.   Right of Set-off.  Upon (a) the occurrence and during the continuance of any Event of Default and (b) the making of the request or the granting of the consent specified by Section 6.01 to authorize the Administrative Agent to declare the Notes due and payable pursuant to the provisions of Section 6.01 or otherwise with the consent of the Majority Lenders, the Administrative Agent and each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and otherwise apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by the Administrative Agent, such Lender or such Affiliate to or for the credit or the account of the Borrower against any and all of the Obligations of the Borrower now or hereafter existing under the Loan Documents, irrespective of whether the Administrative Agent or such Lender shall have made any demand under this Agreement or such Note or Notes and although such Obligations may be unmatured. The Administrative Agent and each Lender agrees promptly to notify the Borrower after any such set-off and application; provided, however, that the failure to give such notice shall not affect the validity of such set-off and application.  The rights of the Administrative Agent and each Lender and their respective Affiliates under this Section are in addition to other rights and remedies (including, without limitation, other rights of set-off) that the Administrative Agent, such Lender and their respective Affiliates may have.

Section 8.06.   Binding Effect; Assignment by Borrower.  (a)   This Agreement shall become effective when it shall have been executed by the Borrower and the Administrative Agent and the Administrative Agent shall have been notified by each Initial Lender that such Initial Lender has executed it and thereafter shall be binding upon and inure to the benefit of the Borrower, the Administrative Agent and each Lender and their respective successors and assigns.

(b)   Neither the Borrower nor any Guarantor shall have the right to assign its rights hereunder or any interest herein or in or under any other Loan Document without the prior written consent of the Administrative Agent.

Section 8.07.   Assignments and Participations.  (a)  Each Lender may and, in the case of a Lender if demanded by the Borrower (following a demand by such Lender pursuant to Section 2.10 or 2.11) upon at least 5 Business Days' notice to such Lender and the Administrative Agent, will, assign to one or more Persons all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of its Commitment or Commitments, the Advances owing to it and the Note or Notes held by it); provided, however, that (i) each such assignment shall be of a constant, and not a varying, percentage of all rights and obligations under and in respect of the Revolving Credit Facility, (ii) except in the case of an assignment to a Person that, immediately prior to such assignment, was a Lender or an assignment of all of a Lender's rights and obligations under this Agreement, the amount of the Commitment of the assigning Lender being assigned pursuant to each such assignment (determined as of the date of the Assignment and Acceptance with respect to such assignment) shall in no event be less than $5,000,000 or an integral multiple of $200,000 in excess thereof, (iii) except in the case of an assignment of all of a Lender's rights and obligations under this Agreement, the remaining Commitment of the assigning Lender shall in no event be less than $5,000,000, (iv) each such assignment shall be to an Eligible Assignee, (v) each such assignment made as a result of a demand by the Borrower pursuant to this Section 8.07(a) shall be arranged by the Borrower after consultation with the Administrative Agent and shall be either an assignment of all of the rights and obligations of the assigning Lender under this Agreement or an assignment of a portion of such rights and obligations made concurrently with another such assignment or other such assignments that together cover all of the rights and obligations of the assigning Lender under this Agreement, (vi) no Lender shall be obligated to make any such assignment as a result of a demand by the Borrower pursuant to this Section 8.07(a) unless and until such Lender shall have received one or more payments from either the Borrower or one or more Eligible Assignees in an aggregate amount at least equal to the aggregate outstanding principal amount of the Advances owing to

TEC000065

such Lender, together with accrued interest thereon to the date of payment of such principal amount and all other amounts then due and payable to such Lender under this Agreement, (vii) the parties to each such assignment shall execute and deliver to the Administrative Agent, for its acceptance and recording in the Register, an Assignment and Acceptance, together with any Note subject to such assignment and a processing and recordation fee of $2,500 (viii) the Administrative Agent shall have given its consent to such assignment and (ix) so long as no Default or Event of Default then exists, the consent of the Borrower (which consent shall not be unreasonably withheld or delayed). Upon such execution, delivery, acceptance and recording, from and after the effective date specified in each Assignment and Acceptance, (x) the assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, have the rights and obligations of a Lender hereunder and (y) the Lender assignor thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights and be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto).

(b)     By executing and delivering an Assignment and Acceptance, the Lender assignor thereunder and the assignee thereunder confirm to and agree with each other and the other parties hereto as follows:  (i) other than as provided in such Assignment and Acceptance, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Loan Documents or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any other instrument or document furnished pursuant thereto; (ii) such assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Loan Party or the performance or observance by any Loan Party of any of its respective obligations under the Loan Documents or any other instrument or document furnished pursuant thereto; (iii) such assignee confirms that it has received a copy of this Agreement, together with copies of the financial statements referred to in Section 4.01 and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such assignee will, independently and without reliance upon Administrative Agent, such assigning Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (v) such assignee confirms that it is an Eligible Assignee; (vi) such assignee appoints and authorizes Administrative Agent, the Collateral Agent and the Security Trustee (or TEC in the case of certain Ship Mortgages) to take such action as agent on its behalf and to exercise such powers and discretion under the Loan Documents as are delegated to Administrative Agent, the Collateral Agent and the Security Trustee (or TEC in the case of certain Ship Mortgages) by the terms thereof, together with such powers and discretion as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all of the obligations that by the terms of this Agreement are required to be performed by it as a Lender.

(c)     The Administrative Agent shall maintain at its address referred to in Section 8.02 a copy of each Assignment and Acceptance delivered to and accepted by it and a register for the recordation of the names and addresses of the Lenders and the Commitments of, and principal amount of the Advances and stated interest thereon owing to, each Lender from time to time (the "Register"). The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrower, Administrative Agent or any Lender at any reasonable time and from time to time upon reasonable prior notice.

TEC000066

(d)       Upon its receipt of an Assignment and Acceptance executed by an assigning Lender and an assignee representing that it is an Eligible Assignee, and fulfillment of any other requirements of Section 8.07(a) and delivery of any Note or Notes subject to such assignment, the Administrative Agent shall, if such Assignment and Acceptance has been completed and is in substantially the form of Exhibit C hereto, (i) accept such Assignment and Acceptance, (ii) record the information contained therein in the Register and (iii) give prompt notice thereof to the Borrower.  Within five Business Days after its receipt of such notice (or, if later, the effective date of the transfer), the Borrower, at its own expense, shall execute and deliver to the Administrative Agent in exchange for the surrendered Note a new Note payable to such Eligible Assignee in an amount equal to the Commitment assumed by it pursuant to such Assignment and Acceptance and, if the assigning Lender has retained a Commitment hereunder, a new Note payable to the assigning Lender in an amount equal to the Commitment retained by it hereunder.  Such new Note or Notes shall be in an aggregate principal amount equal to the aggregate principal amount of such surrendered Note or Notes, shall be dated the effective date of such Assignment and Acceptance and shall otherwise be in substantially the form of Exhibit A hereto.

(e)       Each Lender may sell participations to one or more banks or other entities (other than any Loan Party or any of its Affiliates) in or to all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of its Commitment, the Advances owing to it and the Note or Notes held by it); provided, however, that (i) such Lender's obligations under this Agreement (including, without limitation, its Commitments) shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) such Lender shall remain the holder of any such Note for all purposes of this Agreement, (iv) the Borrower, Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under the Loan Documents and (v) no participant under any such participation shall have any right to approve any amendment or waiver of any provision of any Loan Document, or any consent to any departure by any Loan Party therefrom, except to the extent that such amendment, waiver or consent would reduce the principal of, or interest on, the Notes or any fees or other amounts payable hereunder (to the extent such participant would be entitled to share therein), in each case to the extent subject to such participation, or postpone any date fixed for any payment of principal of, or interest on, the Notes or any fees or other amounts payable hereunder, in each case to the extent subject to such participation.  Any Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in such Lender's Commitment, Advances and/or Notes (the "Participant Register"); provided that such Lender shall have no obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any Commitment, Advance or Note) to any Person except to the extent that such disclosure is necessary to establish that such Commitment, Advance or Note is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(f)       Any Lender may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 8.07, disclose to the assignee or participant or proposed assignee or participant any information relating to the Borrower or any other Loan Party furnished to such Lender by or on behalf of the Borrower or any other Loan Party; provided that, prior to any such disclosure, the assignee or participant or proposed assignee or participant shall agree to preserve the confidentiality of any Confidential Information relating to the Borrower or any other Loan Party received by it from such Lender.

(g)     Notwithstanding any other provision set forth in this Agreement, any Lender may at any time, without the consent of the Borrower or any other Loan Party or the Administrative Agent, create a security interest in all or any portion of its rights under this Agreement and the other Loan Documents (including, without limitation, the Advances owing to it and the Note held by it) in favor of any United States Federal Reserve Bank in accordance with Regulation A of the Board of Governors of the United States Federal Reserve System.

(h)     Notwithstanding any other provision set forth in this Agreement, any Lender may, without the consent of but with notice to the Borrower and the Administrative Agent, assign all or portion of its rights and obligations under this Agreement and the other Loan Documents (including, without limitation, all or a portion of its Commitment, the Advances owing to it and the Note or Notes held by it) to any of its Affiliates. The provisions for assignment set forth in Section 8.07(a)(vii) shall apply mutatis mutandis to any such assignment to an Affiliate of a Lender under this Section 8.07(h).

Section 8.08.    Execution in Counterparts.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery by telecopier of an executed counterpart of a signature page to this Agreement shall be effective as delivery of an original executed counterpart of this Agreement.

Section 8.09.    Confidentiality.  Neither Administrative Agent nor any Lender shall disclose any Confidential Information to any Person without the consent of the Borrower, other than (a) to Administrative Agent's or such Lender's Affiliates and their officers, directors, employees, agents and advisors and to actual or prospective Eligible Assignees and participants, and then only on a confidential basis, (b) as required by any law, rule or regulation or judicial process, (c) as requested or required by any Governmental Authority or examiner (including the National Association of Insurance Commissioners or any similar organization or quasi-regulatory authority) regulating such Lender, (d) to any rating agency when required by it, provided that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Confidential Information relating to the Loan Parties received by it from such Lender, (e) in connection with any litigation or proceeding to which Administrative Agent or such Lender or any of its Affiliates may be a party or (f) in connection with the exercise of any right or remedy under this Agreement or any other Loan Document.  Notwithstanding anything to the contrary contained in this Agreement or in any other Loan Document, any Secured Party or any other Person may disclose to any and all Persons, without limitation of any kind, (i) the federal income tax treatment of the transaction contemplated in the Loan Documents, (ii) any fact relevant to understanding the federal income tax treatment or tax structure of the transaction contemplated in the Loan Documents and (iii) all materials of any kind (including opinions or other tax analyses) relating to such federal income tax treatment or tax structure; this exception to the confidentiality provisions of the Loan Documents is effective from the commencement of discussions with respect to the transaction contemplated in the Loan Documents.

Section 8.10.    Release of Collateral.  Upon the sale, lease, transfer or other disposition of any item of Collateral of any Loan Party (including, without limitation, as a result of the sale, in accordance with the terms of the Loan Documents, of the Loan Party that owns such Collateral) in accordance with the terms of the Loan Documents, the Administrative Agent will, at the Borrower's expense, execute and deliver to such Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Collateral Documents in accordance with the terms of the Loan Documents.

Section 8.11.    Patriot Act Notification.  Each Lender and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Loan Parties that pursuant to the requirements of the USA

TEC000068

Patriot Act (Title III of Pub.L. 107-56 (signed into law October 26, 2001)) (the "Patriot Act") or other similar laws, it is or may be required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify such Loan Party in accordance with the Patriot Act or other similar laws.  The Borrower shall, and shall cause each of its Subsidiaries to, provide such information and take such actions as are reasonably requested by the Administrative Agent or any Lenders in order to assist the Administrative Agent and the Lenders in maintaining compliance with the Patriot Act or such other similar laws.

Section 8.12.   JURISDICTION, ETC.  (a)  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF ANY NEW YORK STATE COURT OR FEDERAL COURT OF THE UNITED STATES OF AMERICA SITTING IN NEW YORK COUNTY, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS TO WHICH IT IS A PARTY, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN ANY SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT SHALL AFFECT ANY RIGHT THAT ANY PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS IN THE COURTS OF ANY JURISDICTION.

        (b)     EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS TO WHICH IT IS A PARTY IN ANY NEW YORK STATE OR FEDERAL COURT SITTING IN NEW YORK COUNTY.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

Section 8.13.   GOVERNING LAW.  THIS AGREEMENT AND THE NOTES SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO ITS CONFLICTS OF LAW RULES.

Section 8.14.   WAIVER OF JURY TRIAL.  EACH OF THE BORROWER, THE ADMINISTRATIVE AGENT AND THE LENDERS HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THE LOAN DOCUMENTS, THE ADVANCES OR THE ACTIONS OF THE ADMINISTRATIVE AGENT, THE COLLATERAL AGENT  OR ANY LENDER IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT THEREOF.

Section 8.15.   Process Agent.  The Borrower irrevocably appoints Corporation Service Company, at 1180 Avenue of the Americas, Suite 210, New York, New York 10036, as its authorized agent (the

TEC000069

"Process Agent") on which any and all legal process may be served in any action, suit or proceeding brought in any New York State Court or Federal Court of the United States of America, in each case sitting in New York County.  The Borrower agrees that service of process in respect of it upon the Process Agent, together with written notice of such service given to it in the manner provided for notices in Section 8.02, shall be deemed to be effective service of process upon it in any such action, suit or proceeding.  The Borrower agrees that the failure of the Process Agent to give notice to it of any such service shall not impair or affect the validity of such service or any judgment rendered in any such action, suit or proceeding based thereon.  If for any reason the Process Agent named above shall cease to be available to act as such, the Borrower agrees to irrevocably appoint a replacement process agent in New York City, as its authorized agent for service of process, on the terms and for the purposes specified in this Section 8.15.  Nothing in this Agreement or any other Loan Document will affect the right of any party hereto to serve process in any other manner permitted by applicable law or to obtain jurisdiction over any party or bring actions, suits or proceedings against any party in such other jurisdictions, and in such matter, as may be permitted by applicable law.

Section 8.16.    Judgment Currency.  The Borrower hereby agrees that: (a) if, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder in Dollars into another currency, the Borrower agrees, to the fullest extent permitted by applicable Law, that the rate of exchange used shall be that at which in accordance with normal banking or administrative procedures, the Administrative Agent could purchase Dollars with such other currency on the Business Day preceding that on which final judgment is given, (b) the obligation of the Borrower in respect of any sum due from it to any Secured Party shall, notwithstanding any judgment in a currency other than Dollars, be discharged only to the extent that on the Business Day following receipt by such Secured Party of any sum adjudged to be so due in such other currency, such Secured Party may in accordance with normal banking procedures, purchase Dollars with such other currency.  In the event that the Dollars so purchased are less than the sum originally due to such Secured Party in Dollars, the Borrower, as a separate obligation and notwithstanding any such judgment, hereby indemnifies and holds harmless such Secured Party against such loss, and if the Dollars so purchased exceed the sum originally due to such Secured Party, such Secured Party shall remit to the Borrower such excess.

Section 8.17.    Partial Invalidity.  If any term or provision of this Agreement or the application to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to persons or circumstances other than those to which it is held invalid or unenforceable, shall not be affected thereby, and each such term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

TEC000070

IN WITNESS WHEREOF, the parties hereto have caused this Senior Secured Credit Facility Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

WAYFARE TRANSOCEANIC LLC., as Borrower

By: _____

Name: Todd M. Capser

Title: President

Signature Page
Senior Secured Credit Facility Agreement

THIRD EYE CAPITAL CORPORATION, as
Administrative Agent, Payment Agent and Collateral
Agent

By: _____

      Name: Arif N. Bhalwani
      Title: Managing Director

Signature Page
Senior Secured Credit Facility Agreement

Lenders

THIRD EYE CAPITAL CREDIT OPPORTUNITIES FUND
- INSIGHT FUND, as Lender

By its Managing General Partner, THIRD EYE CAPITAL
CREDIT OPPORTUNITIES S.AR.L

By: _____
    Name:   Paul de Quant
    Title:    Manager

By: _____
    Name:   Richard Goddard
    Title:    Manager

TEC000073

THIRD EYE CAPITAL ALTERNATIVE CREDIT TRUST,
as Lender

By its Manager, THIRD EYE CAPITAL MANAGEMENT
INC.

By: _____
    Name:
    Title:      **ARIF N. BHALWANI**
                **PORTFOLIO MANAGER**

Signature Page
Senior Secured Credit Facility Agreement

MBI/TEC PDO1 US, L.P., as Lender

By its General Partner, MBI/TEC US PORTFOLIO GP INC.

By: _____
Name: ARIF BHALWANI
Title: PRESIDENT & CEO

Signature Page
Senior Secured Credit Facility Agreement

SCHEDULE I

**COMMITMENTS**

| Initial Lender | Term Loan Commitment | Revolving Credit Commitment | Total Commitment |
|---|---|---|---|
| Third Eye Capital Credit Opportunities Fund - Insight Fund | US$2,096,250.00 | US$68,750.00 | US$ 2,165,000.00 |
| Third Eye Capital Alternative Credit Trust | US$10,481,250.00 | US$343,750.00 | US$10,825,000.00 |
| MBI/TEC PDO1 US, L.P. | US$29,347,500.00 | US$962,500.00 | US$ 30,310,000.00 |
| TOTAL | US$41,925,000.00 | US$1,375,000.00 | US$43,300,000.00 |

- 3 -

TEC000076

SCHEDULE II

## APPLICABLE LENDING OFFICES

**Initial Lender**

**Address of Lending Office**

Third Eye Capital Credit Opportunities Fund - Insight Fund

19, Rue de Bitbourg
L-1273 Luxembourg
Attention:  Robert DeNormandie
Facsimile: +352 26 86 7799
Email: tec@mdo-services.com

Third Eye Capital Alternative Credit Trust

3930 – 161 Bay Street
Toronto, ON  M5J 2S1
Attention: Arif N. Bhalwani
Facsimile: 416 981 3393
Email: arif@thirdeyecapital.com

MBI/TEC PDO1 US, L.P.

3930 – 161 Bay Street
Toronto, ON  M5J 2S1
Attention: Arif N. Bhalwani
Facsimile: 416 981 3393
Email: mbitecgp@thirdeyecapital.com

TEC000077

**SCHEDULE III**

[Reserved]

TEC000078

**SCHEDULE IV**

## <u>SUBSIDIARIES OF THE BORROWER</u>

1. WSO
2. PTI One
3. PTI Two

TEC000079

**SCHEDULE V**

**<u>EXISTING INDEBTEDNESS; GUARANTY OBLIGATIONS</u>**

1.   The Bridge Notes facility

TEC000080

**SCHEDULE VI**

## <u>DISCLOSED LITIGATION</u>

None

TEC000081

**SCHEDULE VII**

## CERTAIN ENVIRONMENTAL MATTERS

None

TEC000082